EVANS *v.* STATE.

(Division A. March 2, 1931.)

[132 So. 563. No. 29271.]

562

**U. B. Parker**, of Wiggins, for appellant.

**W. A. Shipman**, Assistant Attorney-General, for the state.

**McGowen, J.,** delivered the opinion of the court.

Wirt Evans was tried, convicted by the jury, and sentenced by the court to a life term in the state penitentiary on a charge of murder, in the killing of J. E. Harrison, from which judgment he appeals here.

The cause is presented in this court on the brief of appellant setting forth such facts as are most favorable to the appellant, with scant, if any, notice of the facts upon which the conviction rests.

Harrison was a married man, Evans was single. The events of this homicide clustered around the home of a widow who lived in the country, and who had many visitors on the night of the homicide. The accused and the deceased were both candidates for the smiles and society of a young damsel of the neighborhood. The accused met the young lady near Perkinston, and took her in his car to the home of the widow. While there the deceased drove up to the gate, called for the young lady to come out, and requested that she go with him in his car. This she declined to do, and returned to the room where the young man remained, and the deceased drove away, but subsequently returned to the gate, and there ensued some disturbance, during which Houston Evans, brother of appellant, exhibited a shotgun, which was later in the possession of the accused, and requested Harrison to leave, which he did. The accused announced that he would keep the young lady until one o'clock and thereafter the deceased could have her. Evans and the young lady then drove to a nearby town to secure drinks and sandwiches. The deceased made some visits to the same town, where he and his male companion purchased sandwiches, Coca-Cola, and antiseptic, and there is evidence in the record tending to show that the deceased was hilarious and drinking. The two cars, with their occupants, seem to have played a game of "hide and seek" in that part of the country, appearing from time to time at the home of Mrs. Robinson. Each made threats to kill

the other, which threats seem to have been communicated to both parties during the night. The accused spoke of a funeral should Harrison continue to follow him. From the record it is difficult to say which of the parties pursued the other.

The tragedy must have occurred about midnight. Sumrall, the state's witness, testified that he was in company with Harrison. They had left Mrs. Robinson's, and had gone a short distance when they came upon the car driven by the accused, who was accompanied by his brother and the young lady. The car driven by the accused was so parked in the road as to block the passage, and deceased turned his car and drove the front wheels into the ditch with the bumper against the bank of the ditch. The accused then stepped from his car with a double-barreled shotgun in his hand, and, placing it within a short distance of the head of deceased, discharged it, the impact of the load being lodged against the upper front part of the head. At the time of the shooting the deceased had his hand on the steering wheel of the car, and had no weapon in his hand.

The deputy sheriff testified that, when he arrived on the scene a little later, he found the deceased upon the front seat of the car, with a gunshot in the head, the upper front thereof blown off, and the brain exposed—and the gun wadding was in the foot of the car. He found a pistol between the legs of the deceased, pointing outward, the handle to the rear—he being seated thereon. The front wheels of the car were in the ditch.

The accused was the only eyewitness in his behalf. The young lady and the brother were not introduced as witnesses by either side. The defendant testified that there was room for the deceased to have passed by "squeezing," that his own car had stalled for the moment, which was the reason he was standing still when deceased came up to him; and that he stepped from his car with a shotgun and started to shoot, but the safety was on, that at the time he stepped from his car

the deceased was pointing a pistol at him, snapping it, and, just as defendant shot, the deceased had taken the pistol down, and was working with it.

There are many other details as to the various trips of the two principals in this tragedy. The defendant said he had had three or four drinks of whisky. Some witnesses testified that Sumrall, the only eyewitness for the state, was very drunk just before the shooting—which matter was in conflict. There was a great deal of conflicting evidence in this case.

Counsel for the appellant insist that the peremptory instruction requested by him should have been granted, and that the verdict is contrary to the law and the evidence, and complains of the refusal of certain instructions by the court.

The evidence offered by the state tended to establish an assassination. Some point is made on the fact that it was said by some of the state's witnesses that Sumrall, the state's witness, was very drunk. The physical facts seem to support his testimony, and whether or not his testimony was reliable was a question for the jury. Counsel has something to say about the failure to show a motive for the killing. On cross-examination these questions were propounded to the accused:

"Q. You told Mr. Pickering when you got there if Harrison ran into you again you would kill him? A. I said he has been following me all night and I will drive across the bridge, and when he stops me I expect you all will have some place to go to.

"Q. You meant a funeral? A. I guess so.

"Q. And it was not going to be yours? A. I didn't know who it was going to be. The way he was threatening me I figured it might be."

We might cite further from the testimony. Here is a powerful motive, which too often actuates a person who slays his fellowman.

Where the evidence was conflicting, the case was for the jury, whose verdict will not be disturbed on appeal.

Brown v. State, 103 Miss. 639, 60 So. 726; Jackson v. State, 105 Miss. 782, 63 So. 269; Wells v. State, 112 Miss. 76, 72 So. 859; Spight v. State, 120 Miss. 752, 83 So. 84; Chandler v. State, 143 Miss. 312, 108 So. 723; Matthews v. State, 148 Miss. 696, 114 So. 816; Steward v. State, 154 Miss. 858, 123 So. 891.

We invite the attention of the bar to the fact that we do not reverse criminal cases where there is a straight issue of fact, or a conflict in the facts; juries are impaneled for the very purpose of passing upon such questions of disputed fact, and we do not intend to invade the province and prerogative of the jury.

And, further, the appellant requested, and was granted, sixteen instructions, which ran the gamut of the criminal law for the defendant, upon reasonable doubt, presumption of innocence, the right of self-defense. We think the court properly refused to grant any more instructions. It properly refused the several instructions complained of, because the subject-matter of the refused instructions, and the principles of law therein announced, had been fully covered by instructions already given, except, perhaps, one, upon the question of the motive or lack of motive on the part of the accused. We have detailed enough facts to show that this instruction would have been contrary to the evidence in the case, and was properly refused.

In conclusion, we must say that we think there is no reversible error in this record, which, to our mind, reflects the sad fact that the law is being violated in this community; that beverages, intoxicating in their nature, are being sold for drinking purposes. The deceased was drinking antiseptic, and had evidently been discharging his pistol on the public highway, as only one cartridge which had not been discharged remained in the pistol, and he did not fire a shot at the time of the difficulty. The accused admitted that he had had three or four drinks of whisky. The result is much expense to the state, and

to the county in which the homicide occurred; one family is bereaved of father and husband; the other family has one of its members branded as a felon. Surely the words of the Wise Man of Holy Writ should be heeded by our citizenry: "Who hath woe? Who hath sorrow? who hath contentions? who hath babbling? who hath wounds without cause? who hath redness of eyes? They that tarry long at the wine; they that go to seek mixed wine. Look not thou upon the wine when it is red, when it giveth his colour in the cup, when it moveth itself aright. At the last it biteth like a serpent, and stingeth like an adder."

Affirmed.