734 So.2d 225 (1999)
Michael MILLENDER a/k/a Michael Bernard Millender, Appellant,
v.
STATE of Mississippi, Appellee.
No. 96-KA-01318COA.
Court of Appeals of Mississippi.
January 26, 1999.
*226 M.A. Bass, Jr., Hazlehurst, Attorney for Appellant.
Office of the Attorney General by Scott Stuart, Attorney for Appellee.
BEFORE McMILLIN, P.J., COLEMAN, AND SOUTHWICK, JJ.
COLEMAN, J., for the Court:
¶ 1. A jury in the Circuit Court of Copiah County returned a verdict of "Guilty of grand larceny" against Michael Millender, whom the grand jury had indicted for taking, stealing, and carrying away "[t]hree hundred forty two dollars in United States currency, 1 carton of Newport cigarettes, 2 bags of groceries, and one billfold ... of the total and aggregate value of more than two-hundred-fifty dollars ... and the personal property of Lessie Monroe...." The indictment further charged that "Michael Millender is an habitual criminal within the meaning of Section 99-19-81 of the Mississippi Code of 1972." Pursuant to the jury's conviction of Millender of the felony of grand larceny, the trial court entered a sentencing order by which it sentenced Millender "to five (5) years as an habitual criminal with the Mississippi State Department of Corrections." Millender perfected an out-of-time appeal from the trial court's sentencing order, and he presents for our review and resolution two issues, which we quote verbatim from the "Statement of Issues" contained in his brief:
1. THE TRIAL COURT ERRED IN NOT GRANTING A DIRECTED VERDICT OR IN THE ALTERNATIVE A NEW TRIAL BY DENYING APPELLANT'S MOTION FOR A DIRECTED VERDICT AND PEREMPTORY JURY INSTRUCTION AS THE VERDICT IS MANIFESTLY AGAINST THE WEIGHT OF THE EVIDENCE.
2. THE VERDICT OF THE JURY IS THE RESULT OF BIAS, PASSION AND PREJUDICE AS A RESULT OF IMPROPER CLOSING REMARKS BY THE STATE.
However, this Court affirms the sentencing order and sentence which the trial court imposed upon Millender.

I. FACTS
¶ 2. Midmorning on January 3, 1996, James Funchess drove Lessie Nell Monroe and Ms. Monroe's twelve-year-old granddaughter, Murial Monroe, whom Ms. Monroe had formally adopted, to the United States Post Office in Crystal Springs so that Ms. Monroe could obtain her and her granddaughter's Social Security and Supplemental Security income checks. A widow for about two years, Ms. Monroe received both a monthly Social Security check for $399 and a Supplemental Security Income (SSI) check for $91. Murial Monroe also received a Social Security check, apparently based on her natural father's account, in the amount of $399. The monthly total of all three checks was $889.
¶ 3. James Funchess, whose wife was Ms. Monroe's first cousin, then drove Ms. Monroe to the office of "The Meteor," the newspaper in Crystal Springs, where she obtained photocopies of all three Social Security and SSI checks. From the newspaper office, Mr. Funchess drove Ms. Monroe and her granddaughter, Murial, to Kib's Grocery in Crystal Springs, where Ms. Monroe cashed all three checks. Ms. Monroe waited in Kib's Grocery while her *227 granddaughter walked to Tower Loan to pay $43 and then to pay the electric bill and finally to Tillman Furniture to pay $34. After Murial returned to Kib's Grocery, Mr. Funchess drove Ms. Monroe and her granddaughter to the post office where Ms. Monroe bought two money orders. The first money order for approximately $60 was to pay Ms. Monroe's telephone bill, and the second money order was for $10. She intended to send the money order for $10 to her son.
¶ 4. As Ms. Monroe and Murial were descending the post office steps, she encountered Michael Millender, whom Ms. Monroe knew because Millender "used to court [her] granddaughter from California." Murial was not that granddaughter. After Ms. Monroe and Millender exchanged greetings, Ms. Monroe explained that she was on her way home by way of Kib's Grocery. Millender offered to take her to the grocery and then to return Ms. Monroe and Murial to Ms. Monroe's home. Ms. Monroe purchased ten bags of groceries at Kib's Grocery, the total purchase price for all of which was "$115 and a little change." Per Ms. Monroe's custom, she paid Kib's Grocery her December grocery bill in the amount of approximately $200, and she charged her January 3 purchase of $115 in anticipation of paying it when she paid her January grocery bill on the following third day of February.
¶ 5. On the way home, Millender drove Ms. Monroe and Murial by the water company, where Ms. Monroe paid her water bill. Then, Millender drove them home. As Millender and Murial were unloading the bags of groceries from Millender's car, Ms. Monroe saw "the gas man ... down to my neighbors." She told Murial "to go down there and tell them to bring me some gas." Ms. Monroe used propane gas for heating her home. After Murial left to get the gas man, Ms. Monroe entered her home, walked to her bedroom, and joined Millender, who was then sitting in the other chair in her bedroom. Ms. Monroe and Millender talked while the gas man filled the propane gas tank for her home. Murial remained outside her grandmother's home while the gas man filled her grandmother's tank.
¶ 6. After the gas man had filled the tank, he came to the front door to collect for the propane gas. When Ms. Monroe heard the gas man's knocking at her front door, she unzipped her purse which she had placed in a box beside the chair where she sat, got some money from her billfold in her purse, put her billfold back in her purse, and carried her money to the gas man who waited at the front door. Millender remained seated in Ms. Monroe's bedroom as Ms. Monroe went to the front door. As Ms. Monroe was returning to her bedroom, she met Millender in the dining room. Millender told her that his brother had called to ask Millender to take him to work, but Millender said that he would "be back after while."
¶ 7. Ms. Monroe returned to her bedroom with the intention of counting her money because she had not yet paid her accounts at Bigg's Drugs and Ace Hardware. When Ms. Monroe opened her purse to retrieve her billfold and her change purse, she found that both were missing from her purse. She called the police to report the theft of her billfold and change purse. Copiah County Deputy Sheriff Eddie L. Givens responded to Ms. Monroe's call. When he and Copiah County Deputy Sheriff Larry Haynes arrived at Ms. Monroe's home, Ms. Monroe told Deputy Givens that she had approximately $342, although she was not sure of the exact amount. After Ms. Monroe identified Millender as the suspected thief, Deputy Givens contacted the Crystal Springs Police Department, and officers from that department joined the two Copiah County deputy sheriffs at the house where Millender, Millender's brother Charles, and Millender's fiancee, Kim Hackett, lived.
¶ 8. When the officers arrived at the Millender residence, Charles Millender and Kim Hackett were standing under the carport. As the officers' automobiles entered *228 the driveway, Ms. Hackett "broke and ran and called Michael's name and went into the house." The deputies and police officers went to the door to ask where Michael Millender was. Ms. Hackett and Charles Millender replied that Michael Millender "had [gone] up the street to visit a neighbor's house." Ms. Hackett and Charles Millender gave the deputies permission to search the house, which they did.
¶ 9. Ms. Hackett and Charles Millender also gave the deputies permission to search the car parked under the carport. Deputy Givens found the billfold and the change purse which Ms. Monroe later identified as hers under the driver's seat. The billfold contained "two or three pennies and a nickel." Inside the billfold Deputy Givens also found "what you call costume jewelry ... and some credit cards and the Social Security cards belonging to Ms. Monroe." Deputy Sheriff Haynes, who had been in back of the house "looking around," reported to the other officers that he "heard some noise inside the house." The officers again entered the house, and this time, they "found Michael [Millender] under the bed in the middle bedroom." Beside the bed were two bags of groceries.

II. TRIAL
¶ 10. The State called but two witnesses at Millender's trial, Ms. Monroe and Deputy Givens. Our recitation of the facts represents a synthesis of their direct testimony. Millender first called Copiah County Deputy Sheriff Larry Haynes. Deputy Haynes testified that although the other officers and he searched the Millenders' house, the car beneath the house's carport, and Millender's person when he was arrested inside the Millenders' house, they recovered no money from Michael Millender, the car, or the house.
¶ 11. Michael Millender testified in his own behalf. The nature of the two issues which Millender presents to this Court for its review and resolution do not require an extensive review of Millender's testimony other than to recite the following. According to Millender, when the gas man came to Ms. Monroe's front door to collect payment for the gas, Ms. Monroe did not have enough money to pay for the gas, so he returned to her the five dollars which she had insisted he keep for driving her around Crystal Springs earlier that morning. On cross-examination, Ms. Monroe admitted that she had given Millender five dollars, although her testimony involved making change from a twenty-dollar bill in a manner not entirely clear from the record.
¶ 12. Millender testified that after he left Ms. Monroe's home, he learned that his brother was not going to work after all, so he drove to a car wash, where he began to vacuum the interior of his car. While he was vacuuming his car's interior, Millender found the billfold and the change purse, which were lying on the floor beside the passenger's seat. He put them on the front seat and left the car wash to go to his house to see about his fiancee, Kim Hackett. Millender testified that on his way home, he encountered two friends who were walking down the street. Because he stopped to give them a ride, Millender placed the billfold and the change purse which he had found at the car wash beneath the driver's seat of his car. According to Millender, after his two friends exited his car at a street corner in Crystal Springs, he experienced a confrontation with another man who pulled a gun on him. Millender testified that he reciprocated by throwing a bottle at this man, after which he drove away.
¶ 13. Millender continued that while he was on his way to see his fiancee, he stopped by Kib's Grocery, where he bought some items for his fiancee. Millender testified that he had been home with his fiancee for perhaps ten or fifteen minutes, when the deputy sheriffs and police officers arrived. He explained that he had hidden under the bed because he thought that the police had come for him as the result of his confrontation earlier that *229 morning. Millender also testified that on January 3, 1996, he worked at W.G. Coating in Byram, at which employment he earned approximately $350 per week.
¶ 14. During the conference on jury instructions after both the State and Millender rested, the trial court granted an instruction at Millender's request which authorized the jury to acquit Millender of grand larceny but find him guilty of "the lesser included offense of petit larceny, if the jury found from the evidence that he `[took] away a coin purse and a billfold with money of an unknown amount, or less than $250.00, being the personal property of Lessie Monroe ....'" (emphasis added). The jury returned the following verdict: "We, the jury, find the defendant guilty of grand larceny." For reasons rendered opaque by the record, Millender's appeal did not begin until eight months after the entry of the trial court's sentencing order when Millender filed his petition for out of time appeal, which the trial court granted by its order rendered and entered on November 27, 1996.

III. REVIEW AND RESOLUTION OF THE ISSUES

A. Millender's first issue

1. Millender's argument
¶ 15. For his first issue, Millender asserts "[t]hat the trial court erred in not granting a directed verdict or in the alternative a new trial by denying [his] motion for a directed verdict and peremptory jury instruction as the verdict is manifestly against the weight of the evidence." To support his position on his first issue, Millender invites our attention to those portions of Ms. Monroe's testimony in which she expressed uncertainty about "how much money she had" and about "where the money was." For example, when the prosecutor inquired of Ms. Monroe about the amount of money she had in her billfold before she paid the gas man, Ms. Monroe answered, "Oh, it wasI ain't going to say it was $400, but it was right at it I know or more, but I wouldn't say just exactly how much." Millender further invites this Court's attention to the "victim impact statement," which the trial court admitted into evidence on Millender's motion. In her victim impact statement, Ms. Monroe listed her theft losses in the "restitution form" portion of the statement as follows: "money$ 986; carton Newport [cigarettes]$15," for a "total loss to victim" of $1,001.

2. The State's counter argument
¶ 16. The State counters by inviting our attention to the State's direct examination of Ms. Monroe, during which she "detailed how she spent her money paying bills on that day." The State then suggests "[t]hat nothing [in] those figures supports a finding that Mrs. Monroe spent enough after cashing her checks to reduce the amount of her remaining cash to less than $250.00." The balance of the State's argument reviews the discrepancies in Ms. Monroe's testimony which Millender emphasizes in his argument and summarizes its review of those discrepancies as follows: "If they [the jury] had found [Ms. Monroe's] testimony to be unbelievable or totally unreliable[,] they could have rejected it."

3. Resolution of this issue

a. Motion for a directed verdict

1. Standard of review
¶ 17. Motions for directed verdict and judgment notwithstanding the verdict challenge the sufficiency of the evidence supporting a guilty verdict. Butler v. State, 544 So.2d 816, 819 (Miss.1989). In the case of Barker v. State, 463 So.2d 1080, 1082 (Miss.1985), the Mississippi Supreme Court established the test for determining whether a motion for a directed verdict ought to be granted.
In passing upon a motion for directed verdict or peremptory instruction, courts must assume that all evidence for the *230 State is true and that all reasonable inferences that may be drawn from the evidence are true and, if from all the testimony there is enough in the record to support a verdict, the motion should be overruled. Warn v. State, 349 So.2d 1055 (Miss.1977); Rich v. State, 322 So.2d 468 (Miss.1975); Roberson v. State, 257 So.2d 505 (Miss.1972).
¶ 18. In this state, an appellate court reviews the evidence on the last occasion when the sufficiency of the evidence was challenged before the trial court. McClain v. State, 625 So.2d 774, 778 (Miss. 1993). In the case sub judice, the last occasion when Millender challenged the sufficiency of the evidence was after both the State and he had rested. It was then that Millender "ask[ed] the Court to direct a verdict again wherein all the evidence has been presented, in taking the evidence in the light most favorable to the State." Millender's counsel argued, "[W]e would show that [the State has] failed to show that there is [sic] grounds for a case of grand larceny...."

2. Evaluation of the sufficiency of the evidence
¶ 19. The scope of our review of whether the evidence was sufficient to support the jury's verdict that Millender was guilty of grand larceny is commensurate with the scope of Millender's argument on this issue. Our review of Millender's argument established that it consisted of two prongs, the first of which attacked Ms. Monroe's uncertainty about the amount of money which was in her billfold before she discovered that it was no longer in her purse. The second prong was an examination of Ms. Monroe's prior inconsistent statements about the amount of money that was in her billfold before she discovered that it was missing.
¶ 20. About the first prong, i.e., Ms. Monroe's uncertainty about the amount of money which was in her billfold, Ms. Monroe testified that the amount of money in her billfold was "right at" $400. The photo copies of the Social Security and SSI checks which were made at the office of "The Meteor" in Crystal Springs were admitted into evidence. The total amount of those three checks was $889. Ms. Monroe explained how she paid bills on the morning of January 3, 1996. Below is this Court's analysis of the amounts of the bills and other expenditures which Ms. Monroe paid that morning:

Social Security checks plus the SSI
check $889
Tower Loan $ 43
Electric Bill 60
Tillman Furniture bill 34
Money order for her telephone bill 60
Money order for her son 10
Grocery bill for the previous month
of December 200
Water bill 20
Propane gas 85
 ____
TOTAL: $512
Balance of cash on hand $377

¶ 21. Ms. Monroe also testified that she had not yet paid her bills at Bigg's Drugs and Ace Hardware. Under cross-examination, Ms. Monroe acknowledged that she always counted her money after she had paid all of her monthly bills on the third day of every month to determine how much money was "left over." She also acknowledged that she put what money remained in a "Royal Crown bag," where she kept it for the remainder of the month. Sometimes she would place some of her money in her coat pocket.
¶ 22. When Millender's counsel cross-examined Ms. Monroe about an apparent discrepancy between her testimony at trial and the content of her victim impact statement about the amount of her loss, Ms. Monroe testified that a young woman named Ruth Glasper completed the form in response to answers which Ms. Monroe gave to Ms. Glasper's questions. Ms. Monroe testified, "She asked me how much my checks was, and I told her how much all three of them was, you know, and she put that down." Indeed, the victim impact statement contains this statement: "If you are completing this statement for someone else, please complete the following." *231 Beneath this statement appears the signature, "Ruth Glasper" as friend of Lessie Monroe. When Millender's counsel asked Ms. Monroe, "Did you tell Ms. Glasper what you had spent?," Ms. Monroe replied, "I didn't tell her that. She didn't ask me and I didn't tell her."
¶ 23. To convict Millender of grand larceny the jury had to find beyond a reasonable doubt that the amount of money which he removed from Ms. Monroe's billfold was "of the value of Two Hundred Fifty Dollars ($250.00) or more." Miss. Code Ann. § 97-17-41 (Supp.1998). The least value of the amount of money contained in Ms. Monroe's purse found in the record was $342, the amount which Deputy Sheriff Givens testified that Ms. Monroe told him when he went to her home in response to her telephone call to the police. Our analysis of Ms. Monroe's testimony indicates that her estimate that $400 in cash was in her billfold before she paid for the propane gas is consistent with her description of the bills she paid before she returned home with Millender. Ms. Monroe explained the manner in which her victims impact statement reflected that the "total loss to victim" was $1,001.
¶ 24. The jury alone is responsible for resolving questions of disputed facts. Evans v. State, 159 Miss. 561, 566, 132 So. 563, 564 (1931). The Court has characterized both the role of the jury and the manner in which jurors reach a verdict:
[Conflicting evidence] does not necessarily create a "reasonable doubt" of appellant's guilt. Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject, the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into findings of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict.
Gandy, 373 So.2d at 1045.
¶ 25. To determine the credibility of the witnesses, the jurors gauge the value of the conflicting testimony adduced during the trial. Burrell v. State, 613 So.2d 1186, 1192 (Miss.1993); Winters v. State, 449 So.2d 766, 771 (Miss.1984). This task of evaluating the credibility of each witness is properly left to the sole province of the jury. Johnson v. State, 642 So.2d 924, 928 (Miss.1994). To accomplish this arduous task, a jury must be allowed some latitude in deriving the facts from each witness's assertions. For this reason, juries are allowed to draw rational inferences from the defendant's conduct. McClain, 625 So.2d at 781. The jury is also entitled to consider "the motives and interests of the testifying witnesses." Burrell, 613 So.2d at 1192. Ultimately, the jury undertakes the duty of considering "testimonial defects of perception, memory and sincerity." Jones v. State, 381 So.2d 983, 989 (Miss.1980).
¶ 26. The State adduced evidence that more than $250 in cash remained in Ms. Monroe's billfold after she had paid some of her monthly bills on the morning of January 3, 1996. As the jury "was permitted" to do, it discharged "its duty ... to resolve the conflicts in the testimony" which they heard in this case by resolving the conflicts in the State's evidence favorably to Millender's guilt of grand larceny. Regardless of Ms. Monroe's apparent uncertainty about the exact amount of cash in her billfold and Ms. Monroe's apparent prior inconsistent statements about that amount of cash notwithstanding, our standard of review, which requires that we "assume that all evidence for the State is true and that all reasonable inferences that may be drawn from the evidence are true," requires that we find that the evidence was sufficient to support the jury's verdict that Millender was guilty of grand larceny. Therefore, we affirm the trial court's denial of Millender's motion for directed verdict *232 which he made after both the State and he had rested.

b. Motion for new trial
¶ 27. Only in the most general of ways does Millender argue that he is entitled to a new trial. His only assertion which this Court deems relevant to this issue is the following: "Appellant asserts that the verdict of the jury is against the overwhelming weight of evidence and must be the result of bias, passion and prejudice created during the course of [the] trial by the State, as the verdict was obviously not supported by creditable evidence." (emphasis added). Millender did not file a motion for a new trial. As the supreme court explained in Ross v. State, 603 So.2d 857, 861 (Miss.1992), "Under Mississippi law, if an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for new trial." Therefore, this Court finds that Millender has waived this facet of his first issue, and we decline to review it further.

B. Millender's second issue

1. Millender and the State's arguments
¶ 28. Prosecutorial misconduct in the form of "improper closing remarks of the State" constitutes Millender's second issue. Millender argues that the trial was tainted by the closing argument of the prosecutor when he stated in his rebuttal argument, "I submit to you the proof is there, and the proof is beyond a reasonable doubt. Ain't no doubt. It was more than $250, ain't no doubt. He was the only person in that house." The State's response is two-fold. First, it correctly notes that Millender's counsel did not object to these comments about which he now complains on appeal. Thus, the State argues that this second issue is procedurally barred. Secondly, not content to rest on the procedural bar, the State argues that "[t]here was evidence in the record supporting the District Attorney's argument that Mrs. Monroe had more than $250.00 in her purse when it was taken." Therefore, the State rebuts Millender's position on his second issue by arguing that "the District Attorney did not go beyond the bounds of evidence in the record when he made the argument."

2. Procedural bar
¶ 29. The record in this case confirms that the State is correct that Millender's counsel did not object during this allegedly prejudicial closing argument by the prosecutor. "Procedurally, contemporaneous objections `must be made to allegedly prejudicial comments during closing argument or the point is waived.'" Dunaway v. State, 551 So.2d 162, 164 (Miss.1989) (quoting Monk v. State, 532 So.2d 592, 600 (Miss.1988) (citing Marks v. State, 532 So.2d 976, 984 (Miss.1988); Crawford v. State, 515 So.2d 936 (Miss.1987))).
¶ 30. In Johnson v. State, 477 So.2d 196, 209-10 (Miss.1985), the Mississippi Supreme Court stated that:
it is the duty of trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment.
¶ 31. "The reasoning behind the requirements of contemporaneous objections is to allow the trial court to correct the error with proper jury instructions." Dunaway, 551 So.2d at 164 (citing Monk, 532 So.2d at 600-01; Baker v. State, 327 So.2d 288 (Miss.1976)). Because Millender's counsel did not object to the offending prosecutor's *233 comment which he made in his rebuttal closing argument, the prejudicial effect of this closing is not properly preserved for review on appeal. Williams v. State, 512 So.2d 666, 672 (Miss.1987). While we acknowledge the procedural bar to Millender's second issue, the State has waived it and has addressed the issue on its merits. So shall we.

3. Standard of review for prosecutorial misconduct in closing argument
¶ 32. Counsel is limited in his argument to facts introduced in evidence, deductions and conclusions he may reasonably draw therefrom, and the application of the law to the facts. Ivy v. State, 589 So.2d 1263, 1266 (Miss.1991); Davis v. State, 530 So.2d 694, 701-02 (Miss.1988). "Trial courts are allowed considerable discretion to determine whether or not the conduct of an attorney in argument is so prejudicial that an objection should be sustained or a new trial granted." Harvey v. State, 666 So.2d 798, 801 (Miss.1995) (citing Edmond v. State, 312 So.2d 702, 705 (Miss.1975)). "The test to make such determination is whether the natural and probable effect of improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by prejudice." Harvey, 666 So.2d at 801 (citing Johnson v. State, 596 So.2d 865, 869 (Miss.1992)).
¶ 33. "Prosecutors are afforded the right to argue anything in the State's closing argument that was presented as evidence." Hanner v. State, 465 So.2d 306, 311 (Miss.1985) (citations omitted). "However, arguing statements of fact which are not in evidence or necessarily inferable from it and which are prejudicial to the defendant is error." Blue v. State, 674 So.2d 1184, 1214 (Miss.1996) (citing Tubb v. State, 217 Miss. 741, 64 So.2d 911 (Miss.1953)). In the case sub judice, the prosecutor's argument about which Millender complains for the first time before this Court dealt with the amount of money Ms. Monroe spent on her bills and how much was left after paying these bills. The prosecution was arguing that the amount left, after Ms. Monroe paid her bills, was over the statutory requirement of $250. This argument was based upon the evidence which we analyzed in our review of Millender's first issue. We adopt our analysis of the evidence from our review of Millender's first issue as our basis on which to conclude that the prosecutor's argument was about matters in evidence, i.e., the amount of money in Ms. Monroe's billfold before she discovered that it was missing. Thus, the prosecutor's argument, aside from the grammatically questionable use of that four-letter word "ain't," did not constitute prosecutorial misconduct. Because Millender's counsel did not object to the prosecutor's argument that there was no doubt that $250 was in Ms. Monroe's billfold, there is no decision by the trial court for this Court either to affirm or to reverse. Therefore, we conclude our review of Millender's second issue by simply resolving it adversely to him.

IV. CONCLUSION
¶ 34. Although Ms. Monroe's testimony about the amount of money in her billfold before she found it missing was less than exact, and although Millender's counsel succeeded in adducing seemingly prior inconsistent statements which she had made to Deputy Givens and to Ms. Glasper when she called on Ms. Monroe to obtain her victim impact statement, the totality of the evidence was sufficient to support the fact that $250 or more in cash remained in Ms. Monroe's billfold after Millender drove Ms. Monroe and her granddaughter back to Ms. Monroe's home. The jury discharged its duty by resolving the conflicts in the evidence, although its resolution of those conflicts was adverse to Millender's innocence of either grand or petit larceny. Even if Millender's second issue were not procedurally barred, the prosecutor's argument that there was no doubt that $250 was in Ms. Monroe's billfold when Millender took it was not "improper closing remarks" *234 because the State had adduced sufficient evidence to support the argument. This Court affirms the trial court's sentencing order, or its judgment, in which it adjudicated Millender's conviction of grand larceny, and the trial court's sentence of Millender "to five (5) years as an habitual criminal with the Mississippi Department of Corrections."
¶ 35. THE JUDGMENT OF THE CIRCUIT COURT OF COPIAH COUNTY OF THE APPELLANT'S CONVICTION OF GRAND LARCENY AND ITS SENTENCE OF THE APPELLANT TO FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS AN HABITUAL OFFENDER ARE AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO COPIAH COUNTY.
BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., DIAZ, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR.
IRVING AND LEE, JJ., NOT PARTICIPATING.