COLEMAN, J.,
for the Court:
¶ 1. A grand jury in Neshoba County returned a two-count indictment against the appellant, George Jeff Blackwell, III, both of which counts charged Blackwell with uttering forged checks drawn on the checking account of Sarah Jean Williams to “one Tabitha Bozeman, an employee of Wal-Mart, Inc., [knowing said checks] to be false, forged and counterfeit, with the willful and felonious intent ... to injure and defraud Sarah Jean Williams, Wal-Mart, Inc., and Trustmark National Bank, a Mississippi banking corporation, contrary to and in violation of Section 97-21-59 [of the Mississippi Code].” [1] Count one alluded to a bank check in the amount of $329.11, and count two referred to a check in the amount of $409.71, both of which were uttered on the same day, April 11, 1995. Pursuant to Blackwell’s trial on both counts of the indictment, the jury found him guilty of both counts, and the trial court entered its judgment of Blackwell’s conviction of both counts of uttering a forgery, in which judgment the trial court sentenced Blackwell “to serve a term of three (3) years in the Mississippi Department of Corrections and pay a fine of $1,000.00 ....” on count one of the indictment. On count two of the indictment, the trial court sentenced Blackwell “to serve a term of two (2) years in the Mississippi Department of Corrections with this sentence to run consecutively to the sentence imposed upon [Blackwell] in Count I.” Blackwell appeals from that judgment to present the following issue, which we quote verbatim from Blackwell’s statement of the issues required by Mississippi Rule of Appellate Procedure 28(a)(3), for this Court’s review and resolution:
The Court erred in denying the Appellant’s Motion for a Directed Verdict and a peremptory instruction; the verdict was against the overwhelming weight of the evidence.
This Court affirms the trial court’s judgment of Blackwell’s conviction and the two sentences which it imposed upon him.
I. Facts
¶ 2. Blackwell admitted that he gave both checks drawn on Williams’s checking account in Trustmark National Bank with Williams’s signatures subscribed on both to a check-out clerk, Tabitha Bozeman, to pay for two separate purchases of several items on April 11, 1995. To pay for his first set of purchases, which included items for his truck and articles of clothing, Blackwell delivered check number 1578 in the amount of $329.11 to Ms. Bozeman, and to pay for his second set of purchases, which consisted primarily of some tires for his truck, Blackwell delivered check number 1579 in the amount of $409.71 to Ms. Bozeman. Both of these checks also bear the signature, “Jeff Blackwell” and an undecipherable number, perhaps purporting to be Blackwell’s social security number, which were written in smaller script immediately beneath the line located in the low *361 er right-hand corner of both checks, on which Ms. Williams’s signature appeared. Trustmark National Bank returned both checks to Wal-Mart, Inc., because they were allegedly forged.
II. Trial
¶ 3. The State’s first witness, Tabitha Bozeman, the check-out clerk to whom Blackwell gave both checks to pay for both sets of his purchases at Wal-Mart, testified that only Ms. Williams’s signatures were subscribed on both checks when Blackwell presented them to her. According to Ms. Bozeman, Blackwell “ filled [the amounts of each purchase] out whenever I told him the amount.” When the district attorney asked Ms. Bozeman if she “ha[d] any conversation with Mr. Blackwell about the checks themselves,” Mrs. Bozeman answered:
A. No, Sir. He had signed his name on the bottom and -wrote in his social security number along with the numbers. They were kind of hard to read, but he also signed it, so I didn’t ask any questions.
Under cross-examination, Blackwell’s counsel asked Mrs. Bozeman, “Did he write his name below that in your presence?” Mrs. Bozeman said that she was “not real for sure if he wrote it in my presence;” that she “just noticed it [Blackwell’s signature and social security number] was on there when I took the cheek.”
¶ 4. As its second witness the State called Sarah Jean Williams, on whose checking account the two checks were drawn. Ms. Williams acknowledged that Blackwell and she were living together on April 11, 1995, the date that Blackwell presented her two checks to Ms. Bozeman. When the district attorney asked Ms. Williams “whether or not” she signed either check, she answered, “No, I didn’t.” In response to further questioning by the district attorney, Ms. Williams testified that she signed her checks, “Sarah Williams,” but not “Sara J. Williams” as were the two checks for which Blackwell had been indicted. Ms. Williams added that these checks were taken without her permission. In response to the district attorney’s question, “Did you give the Defendant permission to sign these two checks?,” Ms. Williams testified, “No, I didn’t.” She then explained that she did not know that these two checks had been written until she received “a returned check notice from [her] bank” for each check.
¶ 5. Next, Ms. Williams identified a letter which she testified Blackwell mailed to her after he had been arrested and incarcerated on these two uttering forgery charges. The State moved to introduce the letter into evidence, to which Blackwell’s counsel did not object. Ms. Williams read the entire letter to the jury. In it Blackwell expressed remorse for the deterioration of their relationship. Blackwell also wrote, “First, about Rapid Finance, Terry, or no one else knew that I forged your signature.” This statement pertained to another matter totally unrelated to the two crimes of uttering forgery for which Blackwell was being tried in this case. -Blackwell wrote that he was “sorry it happened” and that he “understood about you [sic] pressing charges about it too.” The State rested after it called its third witness, Charles Fowler, a detective with the Meridian Police Department, who testified about his investigation of these charges.
¶ 6. As his first two witnesses, Blackwell called his wife, Darlene Blackwell, and her friend, Theresa Swanner, who testified primarily about Ms. Williams’s several telephone calls which she made to Mrs. Blackwell’s house after Darlene Blackwell and her husband first began to date following the break-up between Ms. Williams and Blackwell. Ms. Swanner testified that she listened to a telephone conversation between Darlene Blackwell and Ms. Williams at Darlene Blackwell’s request. Ms. Swanner corroborated Darlene Blackwell’s testimony that during this telephone conservation, Ms. Williams told Ms. Blackwell that “she never really wanted [Ms. *362 Williams] and [Blackwell] to break up, and if [Darlene Blackwell] would just throw [Blackwell] out, he didn’t have anywhere else to go, so [Blackwell] would come back to her.”
¶ 7. Blackwell testified last. He related that shortly after he met Ms. Williams “around the end of January or the first of February, 1995,” Ms. Williams and he began to live together. According to Blackwell, Ms. Williams and he separated in June, 1995 after he was arrested. Blackwell admitted that he signed Ms. Williams’s names to both checks, and he further explained that he had signed his name and written his social security number on both checks because “they [Wal-Mart] had to have some way of knowing that I was the one that [sic] wrote the check.” This was because Blackwell “knew that my name wasn’t on the account. ...” Blackwell testified that “[f]or about a month and a half after we were together, I had started writing checks on her account.” Blackwell “would just tell her [that he] was going to write a check for [anything he needed].” Blackwell explained, “[Ms. Williams] never said anything after the first time I asked her if I could. She said that was fine.” According to Blackwell, Ms. Williams’s only concern about his writing checks on her account was that “we didn’t get the account overdrawn.”
¶ 8. Blackwell explicated the deterioration of his relationship with Ms. Williams on his having obtained employment in Jackson, where he began spending most of his time. Blackwell told Ms. Williams that he intended to spend the entire “weekend of the 9th, 10th, and the 11th [of June 1995] in Jackson” and that he “was going to get [his] things and move out of the house.” Blackwell was arrested on Monday, the 12th day of June. With reference to his letter written to Ms. Williams after he had been arrested, Blackwell admitted that he had forged Ms. Williams’s name to what was “a ninety-day same as cash loan from Rapid Finance.”
III. Review and resolution of the issue
A. Blackwell’s and the State’s arguments
¶ 9. Blackwell argues that at most he is guilty of “false pretense” because, to quote from his brief:
One who executes an instrument purporting on its face to be executed by him, when in fact he has no authority from such principal to execute such instrument, is not guilty of forgery, as the instrument is nothing different from what it reports to be, the act being a false pretense; this is not a false making of an instrument, but merely a false and fraudulent assumption of authority. 37 CJS Sec. 8.
¶ 10. Blackwell contends that whether his “writing the checks was a fraudulent assumption of authority, it was not forgery, because his writing the checks in the presence of the clerk and writing his name on the checks manifested no intent to deceive by making the checks different from what they purported to be.” Somewhat circuitously, Blackwell continues that “[e]ven if [Blackwell] did not have authority to write the checks, his writing them was not forgery but a fraudulent assumption of authority, because [he] openly wrote the checks and identified himself as the writer.” The State counters that the evidence adduced by both it and Blackwell created a classic jury question for the jury’s resolution and that “[i]t was for the jury to decide whether Blackwell’s act of signing his own name and SSN was a subterfuge designed to nutrient an intent to defraud.”
B. Forgery versus obtaining money under false pretense
¶ 11. Rowland v. State, 531 So.2d 627, 631 (Miss.1988) refutes Blackwell’s argument that “[although he may have been guilty of false pretense, he was not guilty of forgery.” In Rowland, the supreme court discussed the similarity between the *363 crimes of obtaining money by false pretense and forgery:
[T]he crimes of obtaining money by false pretense and of forgery are quite similar. While it would be quite possible to commit the crime of obtaining money by false pretenses without committing the crime of forgery, it is extremely unlikely that an accused could be guilty of forgery and at the same time not also be guilty of obtaining money by false pretenses. The fact that [the appellant] could be guilty of either, however, does not entitle him to be prosecuted only for the lesser offense....
Id. Thus, even if Blackwell had been guilty of “false pretense” because he falsely represented to Wal-Mart’s check-out clerk that he was authorized to negotiate Mrs. Williams’s check regardless of whether she had signed it, the “false pretense” aspect of his tendering the two checks drawn on Mrs. Williams’s checking account with Trustmark National Bank does not preclude the State’s prosecuting Blackwell for forgery.
C. Sufficiency of the evidence
¶ 12. The thrust of Blackwell’s only issue is two-fold. His assertion that the trial court erred in denying his requested peremptory instruction of not guilty implicates the sufficiency — but not the weight— of the evidence. In Brooks v. State, 695 So.2d 593, 594 (Miss.1997), the Mississippi Supreme Court again recited the following standard of review to be “applied when the assignment of error turns on the sufficiency of evidence”:
When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury’s verdict is quite limited. We proceed by considering all of the evidence — not just that supporting the case for the prosecution — in the light most consistent with the verdict. We give the prosecution the benefit of all inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered pointf] in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is beyond our authority to disturb,
(citations omitted).
¶ 13. We previously noted that under direct examination Blackwell explained that he had signed his name and printed his social security number on each of the two checks because he “knew that [his] name wasn’t on the account, and ... they [Wal-Mart] had to have some way of knowing that I was the one that [sic] wrote the check.” His explanation amounts to an admission of forgery of these two checks unless Ms. Williams had given him permission to subscribe her name on checks drawn on her checking account. Ms. Williams categorically denied that she had given Blackwell permission to sign her name to her checks.
¶ 14. Freeman v. State, 293 So.2d 469, 470 (Miss.1974) supports our determination that the evidence was sufficient to support the jury’s verdicts that Blackwell was guilty of forgery. In Freeman, Kenneth Tatum, on whose checking account the State charged that Freeman had forged a check in the amount of $134, never testified that “he did not authorize [Freeman] to sign his (Tatum’s) name to his personal checks.” Id. While the supreme court opined that “Tatum should probably have been asked directly and specifically if he had authorized another to sign his checks,” it affirmed Freeman’s conviction of forgery because “inferences drawn from [Tatum’s] testimony lead to no other reasonable conclusion but that he had definitely not authorized anyone else *364 to sign his name on his personal checks.” Id. The supreme court concluded “that the circumstantial evidence in this case was certainly strong enough to make out a prima facie case for the State.... ” Id. at 471.
¶ 15. In the case sub judice Ms. Williams testified that she did not give Blackwell any of her personal checks, and she emphatically denied that she had given Blackwell permission to sign her name to her checks. The first of the three essential elements of forgery is “a false making or other alteration of some instrument in writing.” Rowland, 531 So.2d at 630. If Blackwell signed Ms. Williams’s name to the two checks which the State charged were forgeries without Ms. Williams’s permission, then there was “a false making” of both checks by Blackwell. Freeman supports our conclusion that the State’s evidence established a prima facie case of Blackwell’s guilt of forging both checks drawn on Ms. Williams’s account; thus, we affirm the trial court’s denial of Blackwell’s request for a peremptory instruction of not guilty.
D. Weight of the evidence
¶ 16. In Morgan v. State, 681 So.2d 82, 93 (Miss.1996), the supreme court reiterated the standard of review for determining whether the jury’s verdict in a criminal case was so against the overwhelming weight of the evidence that a new trial ought to have been granted:
We will not reverse a trial judge’s denial of a motion for a new trial unless we are convinced that the verdict is so contrary to the weight of the evidence that, if it is allowed to stand, it would sanction an unconscionable injustice.
The State asserts that “[t]he prosecutor got it right during closing argument when he stated:
What the case is about, however, is whether or not the Defendant took these two forged checks to Wal-Mart and presented them for cash or merchandise or whatever the case may be. If you believe him [Blackwell], that he had permission to do that, well, you have got to find him not guilty; but if you believe Sarah Williams that he didn’t have her permission to do that, then he is guilty of both counts in the indictment.
¶ 17. In criminal prosecutions, the standard of proof required to uphold a guilty verdict is beyond a reasonable doubt. Gandy v. State, 373 So.2d 1042, 1045 (Miss.1979). The jury alone is responsible for resolving questions of disputed facts. Evans v. State, 159 Miss. 561, 132 So. 563, 564 (1931). The Court has characterized both the role of the jury and the manner in which jurors reach a verdict:
[Conflicting evidence] does not necessarily create a “reasonable doubt” of appellant’s guilt. Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject, the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into findings of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict.
Gandy, 373 So.2d at 1045.
¶ 18. To determine the credibility . of the witnesses, the jurors gauge the value of the conflicting testimony adduced during the trial. Burrell v. State, 613 So.2d 1186, 1192 (Miss.1993); Winters v. State, 449 So.2d 766, 771 (Miss.1984). This task of evaluating the credibility of each witness is properly left to the sole province of the jury. Johnson v. State, 642 So.2d 924, 928 (Miss.1994). To accomplish this arduous task, a jury must be allowed some latitude in deriving the facts from each witness’s assertions. For this reason, juries are allowed to draw rational inferences from the defendant’s conduct. McClain v. State, 625 So.2d 774, 781 (Miss. *365 1993). The jury is also entitled to consider “the motives and interests of the testifying witnesses.” Burrell, 613 So.2d at 1192.
¶ 19. In the case sub judice, the jury accomplished its “arduous task” of resolving the irreconcilable conflict between Ms. Williams’s and Blackwell’s testimony in the milieu of their soured live-in relationship. The verdict of “guilty as charged” demonstrates that the jury found Ms. Williams’s testimony more credible than Blackwell’s. “It is also true that the testimony of a single witness is sufficient to sustain a conviction though there may be more than one witness testifying to the contrary.” Nash v. State, 278 So.2d 779, 780 (Miss.1973). This Court finds no “unconscionable injustice” in the jury’s verdicts that Blackwell was guilty of having uttered two checks which he knew were forged on Ms. Williams’s checking account, and it accordingly affirms the trial court’s denial of Blackwell’s motion for a new trial.
¶ 20. THE JUDGMENT OF THE CIRCUIT COURT OF NESHOBA COUNTY OF APPELLANT’S CONVICTIONS OF BOTH COUNTS OF UTTERING FORGERY AND ITS SENTENCES OF APPELLANT TO PAY A FINE IN THE AMOUNT OF $1,000 AND TO SERVE THREE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ON COUNT I AND TO SERVE TWO YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ON COUNT II TO RUN CONSECUTIVELY TO THE SENTENCE IMPOSED IN COUNT I ARE AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO NESHOBA COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.

. Section 97-21-59 defines this crime as follows:
Every person who shall be convicted of having uttered or published as true, and with intent to defraud, any forged, altered, or counterfeit instrument, or any counterfeit gold or silver coin, the forgery, altering, or counterfeiting of which is declared by the provisions of this chapter to be an offense, knowing such instrument or coin to be forged, altered, or counterfeited, shall suffer the punishment herein provided for forgery.
Miss.Code Ann. § 97-21-59 (Rev. 1994).