# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-00710-SCT

*JARVIS SHELTON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 4/14/2001 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WESLEY THOMAS EVANS |
| ATTORNEY FOR APPELLEE: | OFFICE OF ATTORNEY GENERAL |
| | BY:     BILLY L. GORE |
| DISTRICT ATTORNEY: | JAMES H. POWELL, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/31/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1.     On April 2-14, 2001, Jarvis Shelton (Shelton) was tried by a jury in the Circuit Court of Yazoo

County, the Honorable Jannie M. Lewis, presiding, for the crime of capital murder.  Shelton was convicted

by the jury and received a life sentence.  From that conviction and sentence, Shelton appeals to this Court.

### FACTS

¶2.     Lisa Crow (Lisa) owned a store named the Cheshire Cat in Yazoo City.  On August 16, 1996,

twin sisters Katie and Molly Crow saw Shelton leave their mother's store with a green money bag and their

mother's purse under his right arm. When the girls entered the store, Katie and Molly found their mother, Lisa, on the floor with a severe head injury. Later that evening, Lisa died at the hospital.

¶3.     Earlier that same afternoon at about 4:00 p.m., the two girls were in their mother's store. Shelton was also in the store at this time. Lisa grew suspicious of Shelton and asked the girls to stay in the store with her. The girls stayed in the store with their mother about 10-15 minutes and left the store after Shelton walked out the door. Molly and Katie identified Shelton at trial as the man inside their mother's store.

¶4.     At 5:00 p.m. Molly called her mother and arranged to pick her up at the store. Lisa told Molly that there was one more customer in the store, but to come and get her. Molly and Katie drove the two to three minute trip to the store and parked the car directly in front of the doorway. Molly testified that when the girls arrived she saw Shelton come out of the store with her mother's ivory colored purse and a green money bag. Shelton was carrying the money bag under his right arm. Molly stated that she had a good look at Shelton and knew that he was the same man that was in the store earlier that day. Shelton looked at Molly and "took off up the street." Molly went inside the store, saw her mother lying on the floor with blood around her head and called 911.

¶5.     Katie testified that she saw Shelton with her mother's purse under his right arm and the green money bag leaving the store. Katie chased Shelton up the street. Katie then went home and got her father. When they returned to the store, she saw that her mother had a head injury and blood was coming out of her ears and nose.

¶6.     Molly and Katie went to the police station that night, August 16, and looked at photographic books of arrestees in Yazoo City. Molly looked at five to six mug books, but Shelton's photograph was not in the books. The girls also viewed three physical lineups on three different nights and picked Shelton from one of the lineups. Molly did state that she identified another individual in another lineup as a person that

2

looked most like the person leaving the store. Molly stated that the police asked her to do this, but she made it clear that she was not making a positive identification. Katie stated that she looked at hundreds of photographs. Although Katie did not see a photograph of Shelton, she did pick a few photographs of men to give the police an idea of Shelton's appearance. Katie later picked Shelton out of the third lineup.

¶7.    Robert Hicks (Hicks) testified that he has known Shelton for a long time. On August 16, 1996, Hicks saw and spoke to Shelton near the Black & White department store on Main Street in Yazoo City around 4:00 p.m. As Hicks was leaving the department store around 4:20, he saw Shelton speaking to the Brown brothers, Tommy and Joseph.

¶8.    Tommy Brown (Tommy) testified that on August 16 he was laying brick within about 800 feet of the crime. A man, who Tommy later identified in court as being Shelton, came up to the brothers and asked them how long they were going to be in the area. The man returned later that day and asked the same type of questions. In fact, Tommy stated that Shelton came by the area a few times that day, approximately before 12:00, between 2:00 to 3:30, and sometime after 4:00. Tommy described Shelton as wearing a cap, khaki pants, and a plaid shirt, and having some facial hair. Joseph Brown (Joseph) gave similar testimony as his brother. He was laying brick on August 16, 1996, on Main Street in Yazoo City and was approached by Shelton. Shelton kept asking the same questions over and over again. Joseph stated that Shelton came by numerous times around 12:00, 2:00, and about 4:20 or 4:30. He described Shelton as wearing a brown cap, brown pants and a plaid shirt.

¶9.    Michael Biasello (Biasello) was working for the FBI and on complaint duty on July 25, 1997. At 11:45 a.m. he received a call from a man who identified himself as Jarvis Shelton. Shelton apparently stated that he was in the Yazoo County jail which Biasello confirmed with Wade Woods at the Yazoo City

3

police department. Biasello stated that the person began the conversation by complaining about his attorney and the police department and continued as follows:

He [person on the phone] went on to say that he had seen a police report which indicated that a claw hammer was found at the scene of the murder, which was an antique store, and he said the claw hammer was not the murder weapon, that he'd have to check his car. And I believe I asked him, "Why would you have to check your car?" And he responded, "To see if the object was in there." And I said, "What object?" And he said, "The blunt object." And I said, "What was the cause of death in the murder?" And he said, "A blunt object." And I asked him if he was aware of the significance of what he was telling me, and he said that he - - I believe he said he had to go or words to that effect, and he hung up the phone.

William Mercer (Mercer), who was in custody of the Mississippi Department of Corrections at the time of trial, testified that he met Shelton in April 1997 while they had "yard call" at the facility. Shelton told Mercer that his case involved a middle age woman in Yazoo City and that "he had looked at - - he had scoped the place for a couple of days." According to Mercer, Shelton "cased" the place for a few day. There was too much "traffic" on the first day so he went back the second day. Shelton watched the place and actually entered two or three times. Finally, just before closing time, Shelton entered and hit the lady with a pipe wrench. He left with the money bag and purse and did not realize that the daughters were the people that had pulled in as he was leaving.

¶10.    Dr. Steven Hayne (Dr. Hayne), a forensic pathologist who performed the autopsy on Lisa's body, testified that she had a tear that was two and one half inches by one and one half inches on the back of her head. The tear had a star-shape and was in the mid back of the head. This injury produced a straight line skull fracture. The resulting blow to the back of the head produced other fractures in the head and hemorrhaging. Dr. Hayne testified that this type of injury indicated that a large amount of force by a broad surface was delivered to the head. The cause of death was determined to be blunt force trauma which produced cranial cerebral trauma. When asked if either a pipe wrench or a crescent wrench could be

4

capable of producing the type of injuries that Lisa sustained, Dr. Hayne stated, "If struck on the flat surface, either of those instruments, if the instruments were large in size, it could easily produce that, if delivered with force."

¶11.    Following his conviction, Shelton appealed to this Court raising the following issues:

**I.    Whether the trial court erred by refusing to suppress the pre-trial identification of evidence and testimony of the out-of-court show up identification and by allowing the in-court identification testimony of Molly Crow and Katie Crow.**

**II.    Whether the trial court erred by denying Shelton's motion for continuance based upon illness of the defense attorney.**

**III.    Whether the trial court erred by failing to grant Shelton's motion for mistrial after a prospective juror stated in voir dire that this was the second capital murder trial for Shelton.**

**IV.    Whether the trial court erred in refusing to grant Shelton's motion for a mistrial based on the witness's improper comment regarding Shelton's right to testify or remain silent under Amendment V of the United States Constitution and Article 3, Section 26 of the Mississippi Constitution of 1890.**

**V.    Whether the court committed reversible error when it refused to grant a directed verdict.**

## DISCUSSION

**I.    Whether the trial court erred by refusing to suppress the pre-trial identification of evidence and testimony of the out-of-court show up identification and by allowing the in-court identification testimony of Molly Crow and Katie Crow.**

¶12.    "The standard of review for suppression hearing findings concerning pretrial identification is whether or not substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted.... The appellate review should disturb the findings of the lower court 'only where there is an absence of substantial credible

5

evidence supporting it.'" *Horne v. State*, 825 So.2d 627, 637 (Miss. 2002) (quoting *Ellis v. State*, 667 So.2d 599, 605 (Miss. 1995)).

¶13.   The court must consider the five *Biggers* factors to determine whether the standard has been met for the identification testimony. *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).   The five factors are as follows: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty exhibited by the witness at the confrontation; and (5) the time between the crime and the confrontation." *Horne*, 825 So.2d at 637 (citing *Neil v. Biggers*, 409 U.S. at 199- 200, 93 S.Ct. at 382).

¶14.   Shelton argues that the trial court should have suppressed the pre-trial identification by Katie and Molly and their in-court identification because the identification was unreliable.  In January 1999, the trial court conducted a hearing on Shelton's motion to suppress witness identification.  The trial court denied the motion and allowed testimony from the girls during trial.  The trial court stated:

> Next is the motion to suppress the identification of evidence.  As to the evidence on the motion to suppress for identification of the defendant, the Court finds that there was no improper suggestion by law enforcement or any improper conduct during  photographic lineup or the physical lineup; nor was there any improper conduct on the photograph that was placed in the lineup.  There was nothing to suggest that there was any impermissible conduct by any law enforcement; therefore, the motion to suppress the identification evidence is denied.

¶15.   Shelton complains that Lisa was alone and there was no witness to the crime against her.  He claims that Katie's testimony, in particular, made her identification unreliable.  However, Shelton argues that both girls falsely identified someone other than Shelton in the photographic lineup.  In addition, Shelton claims that he "was not represented by counsel at the lineup at which he was identified."  Before analyzing the *Biggers* factors, we will discuss both Katie and Molly's testimony as well as the claim that Shelton had

6

no counsel at the lineup. We find that from the onset the record reflects that Shelton has not been entirely accurate in revealing the complete facts of the case.

### A. Katie and Molly

¶16. Shelton argues that Katie allegedly saw the man, but did not see his face. In his brief, Shelton further states the following:

> According [to] the testimony of Katie Crow at the pre-trial suppression hearing, Katie Crow never got a good look a[t] the face of the black man she saw around the area. Katie pick [sic] out another man in the photo lineup who was not Jarvis Shelton. In fact, Katie Crow picked at least two or more individuals out of the photo lineup who were not Jarvis Shelton as the black man she allegedly saw coming out of the store.

Shelton also argues that *both* girls "falsely identified someone else other that [sic] the appellant in the initial photographic lineup." Shelton's characterization that Katie "never got a good look a[t] the face of the black man" is inaccurate as reflected by the record. Although not specifically addressed, Molly's testimony indicates that she also saw Shelton. The record also reflects that both girls picked men that looked the most like the man at their mother's store on August 16. However, neither girl positively identified anyone until the third lineup.

¶17. The girls came to the store at approximately 3:00 p.m., left, and then returned at 5:00 p.m. The record does reflect that at the time Katie was in the store at about 3:00 p.m. she *initially* stated that the first time she looked she did not see the face of the customer upstairs in her mother's store. However, she later stated that she did see the customer and the following exchange occurred during the hearing:

> Q.[defense]    Okay. And so, this was a man upstairs and you couldn't see his face initially, right?
> A.             Yes, sir.
> Q.             And then, at some point, you indicate that you saw his face; is that true?
> A.             Yes, sir.
> Q.             Was that when he came downstairs?

| | |
|---|---|
| A. | I had seen him while he was upstairs and then he came downstairs and I watched - - I looked at him. |
| Q. | Okay. Now, according to your testimony now, the first time you saw his face, was that not when he came downstairs? Now, you correct me if I'm wrong. Wasn't it true that the first time you saw his face was when he came down the stairs? |
| A. | No, I saw him while he was upstairs. |
| Q. | Okay. And you saw his face while he was upstairs; is that right? |
| A. | Just a little bit, yes, sir. |

When the girls came back to their mother's store around 5:00 p.m. Katie saw the man coming out of her mother's store. The following are exchanges between Katie and the defense counsel and Katie and the prosecution:

| | |
|---|---|
| Q.[defense] | Now, at some point later, you - - okay. Let's just go back for just a minute. This man that you saw coming out of the store, as he walked out of the store, did he turn immediately? |
| A. | Yes, sir. He saw that we had pulled up and he opened the door while we were pulling up and looked to the left and I saw his face. |
| Q. | Okay. So, you saw his face when he looked to the left? |
| A. | Yes, sir, he looked - - he had to look to the left to look at us. |
| Q. | Okay. And you were to his left? |
| A. | Yes, sir. |
| Q. | So his - - |
| A. | Straight in front of him and then he looked. |
| Q. | Okay. So, he just looked and then took off? |
| A. | Uh-huh, (affirmative). |

Katie then testified that she looked at photographs in the mug books at the police station. For later lineups, the police first showed Katie individual photographs of the lineup and then she saw a physical lineup of men. Katie looked through the stack of photographs by herself. On the day of the first lineup, Katie stated that she picked a man who looked similar and most like the man she saw at the store. Katie also looked at more photographs after the lineup and again picked a few pictures of men who looked most like the man at her mother's store. All together, Katie looked at three lineups.

| Q.[defense] | Did you know when you - - strike that. When you saw my client in the lineup, you knew you had seen him a couple of days earlier in one of those pictures that you said looked something like the man? |
|---|---|
| A. | I know I saw him in my mama's store that day. |

*****

| Q. [prosecutor] | Did you - - in relation to what your mother told you about the person there in the store and her being afraid to be alone, what if anything did that cause you to do with regard to him? |
|---|---|
| A. | Look at him and I noticed him. |
| Q. | Okay. Did it cause you to pay more attention to him than you otherwise would have? |
| A. | Yes, sir. |

*****

| Q. [prosecutor] | Now, at that time [during the third lineup], did you have any problems or any trouble at all or any doubts at all in identifying the person that you saw in the store both earlier in the afternoon of the 16th and leaving the store with your mother's purse from the lineup that you viewed the last time? |
|---|---|
| A. | No, sir. |
| Q. | And you did pick somebody out and make a positive identification at that time, didn't you? |
| A. | Yes, sir. |
| Q. | And who was that person that you picked out? |
| A. | That man right there. |
| Q. [prosecutor] | Okay. Your Honor, may the record reflect she again pointed to the defendant. |

¶18.     As to the assertion that the girls "falsely identified someone else other that [sic] the appellant in the

initial photographic lineup", Katie stated that prior to picking Shelton out of the lineup that she never

positively identified anyone or any photograph as being the person that was in the store. Katie did testify

that during the first lineup on August 18, she picked someone other than Shelton. However, Katie testified

that "I picked out a man that I said looked similar to him [the man at the store], but I didn't think it was

him." She then stated that she could not make a positive identification on that person. Katie even picked

9

out a few photographs of people and stated "I picked a few out that looked most like him but I didn't pick any certain one out. I picked a few out that resembled him the most." Nevertheless, Katie stated that there is a difference between seeing someone in a photograph and seeing them in person. She did not want to make a positive identification until she was sure that she picked the correct person. When questioned why she chose Shelton, Katie stated "[b]ecause that's the man I saw that day walking out of the store with my mama's purse."

¶19. Molly also gave testimony that she saw the man in her mother's store. She stated that while she was in the store "I did see his face." In addition, she stated that she looked at his face "[e]very - - every chance I got, I did, yes sir." Molly also testified that she picked a photograph of a man that looked similar to the man at the store. At the first lineup on August 18, Molly picked a man who looked similar to the man at the store, however, she did not make a positive identification. At the hearing, Molly also identified Shelton as being the man in the store. Of all the photographs that Molly viewed, she gave no positive identification of any person. However, Molly stated that she had no doubt and was positive that the man she picked from the lineup on August 21, 1996, was the correct person.

¶20. Clearly, Shelton is mistaken in his assertions. The record shows that Katie initially did not see the face of the man when she first entered her mother's store on August 16, 1996. Shortly thereafter however, Katie saw the face of the man and his general features while in the store and as the man exited the store at 5:00 p.m. Molly also testified that she saw the man that day. Furthermore, both girls testified that they chose men who looked the most like the man in their mother's store from photographs and the first lineup. However, neither girl made a positive identification until they saw Shelton.

B.      Representation by Counsel at the Lineup

10

¶21.    Shelton also argues that he was not represented by counsel at the lineup.  Upon review of the record, we conclude that Shelton is mistaken in his assertion.[1]  During the hearing, the prosecution questioned Wade Woods (Woods), the Assistant Chief of Police with Yazoo City at the time of crime, about the lineups.  The following exchange occurred between the prosecution and Woods:

> Q.    Okay.  All right.  Okay. Now, later on that day [August 21, 1996] that [Shelton] was arrested, that's the time that the final lineup was conducted, the third line-up [sic]?
>
> A.    He was arrested that morning.  Shortly after his arrest, and when he told us he wanted to speak to his attorney, we terminated the interview.  He was processed, booked, fingerprinted, and photographed, placed in jail, and shortly thereafter, **an individual arrived at the police department identifying himself as Mr. Shelton's attorney of record, Jim Arnold.**
>
> Q.    Okay.
>
> A.    We briefed Mr. Arnold on what had transpired that morning, and he wanted an opportunity to confer with Mr. Shelton, and we provided him with that opportunity.
>
> **Q.    Okay.  All right.  At the time that the lineup was conducted, was Mr. Arnold present?**
>
> **A.    He was.**
>
> Q.    Where was he located at the time the lineup was being conducted?
>
> A.    He was in the viewing room where I had the witnesses during the entire lineup.
>
> Q.    Okay.  So he was already waiting as each witness came in.  Did he ever leave during, between any of the witnesses coming and going?
>
> A.    I couldn't say.  He was in there when I would come in with a witness.
>
> Q.    Every witness you brought in, he was already there?
>
> A.    Yes, sir.  I believe he signed, did he not sign as a witness?
>
> Q.    Yeah.  And I believe you're referring to the - -
>
> A.    The identification sheets.
>
> Q.    That was conducted.  There's a block on those sheets for signature of attorney?
>
> A.    Yeah.  He signed all of them.
>
> **Q.    Mr. Arnold signed as the attorney during that 21st lineup on each and every form, did he not?**
>
> **A.    Yes, sir.**  In fact, the reason for having the lineup that night, we had really wanted to have it shortly after Mr. Shelton's arrest, but Mr. Arnold said he had a conflict and had to be in court somewhere or something like that and asked if we could postpone the lineup until that night, and we agreed to accommodate him.

---

[1]  Shelton was initially represented by attorney Jim Arnold.  At trial, Shelton was represented by two other attorneys, and on appeal Shelton is represented by yet different attorneys.

(emphasis added).

¶22.   Clearly, Shelton is mistaken in his assertion that he was not represented by counsel at the time of the lineup.

### C.   The *Biggers* Factors

¶23.   We now turn to the *Biggers* factors:

**(1)   the opportunity of the witness to view the criminal at the time of the crime.**

¶24.   Neither girl actually saw anyone harm their mother.  However, both girls were in their mother's store at about 3:00 p.m. and saw Shelton in the store.  They both saw his face.  The girls left the store after Shelton.  When the girls returned to the store around 5:00 p.m. they parked in front of their mother's store.  Both girls saw Shelton leave the store.  At the hearing, both girls stated that Shelton had their mother's purse under his arm as he was leaving the store and Molly stated that he also had her mother's green money bag.

**(2)   the witness's degree of attention.**

¶25.   The girls' mother was concerned about the customer in her store around 3:00 p.m. Because of the concern, Katie stated "I watched - - I looked at him" and "I looked- - I can say that I looked at him well enough to - - I mean, I didn't just glance and look away."

¶26.   When the girls returned to the store around 5:00 p.m. Katie was "[r]ight in front of the store in my car" when she saw Shelton leaving her mother's store.  She noticed that Shelton came out of the store quickly and was carrying her mother's purse.  Katie saw the man's face and watched as he opened the door to the store as she and Molly were pulling into a parking space.

12

¶27.   At one point, Katie also acknowledged that the man had stood approximately six to ten feet away from her, while he was in the store earlier that afternoon.  Katie stated that her mother was uncomfortable because of the man upstairs in the store and did not want to be alone in the store by herself.  Since her mother was concerned, it made Katie "[l]ook at him and I noticed him."  She stated that she picked Shelton out of the lineup "[b]ecause that's the man I saw that day walking out of the store with my mama's purse."

¶28.   Molly stated that earlier that day when she entered to the store, the  man was upstairs.  She saw his face from upstairs.  The man glanced down toward her and then looked away when he noticed that she saw him.  Again, Molly stated "I did see his face" and  that she looked at his face "every chance I got."  She was paying particular attention to the man because her mother told Molly that she was suspicious of the man.  Molly also stated later in the day she pulled into a parking space, stopped the car, and saw the man quickly coming out of the door to the store.  Molly identified Shelton in the following exchange with the prosecutor:

> Q.   Okay.  Is there any doubt - - at 5:00 when you saw this person coming out of the store, is there any doubt that it was the same person that had been in the store earlier that day?
> A.   There's no doubt.
> Q.   That you observed and that your mother told you she was afraid of?
> A.   Yes.
> Q.   Those were the same people and you're sure of that?
> A.   Yes, sir.
> Q.   And that person is Jarvis Shelton, the defendant?
> A.   Yes, sir.
> Q.   Was your identification of Mr. Shelton in this case based upon anything other than you being sure that you saw him on that day on both occasions?
> A.    No, sir.        **(3)     the accuracy of the witness's prior description of the criminal.**

13

¶29. Katie described the man as a black male about 35 or 36 years old. She described the clothes, a plaid shirt and tan jeans, that he was wearing that day. In addition, Katie stated the man was skinny, wore a hat that was facing frontwards, was about 5'6" tall, had facial hair and had pockmarks or acne on his face.

¶30. Molly described the man as having a beard or facial hair. She also stated that the man's face was scarred and/or had acne scars, he was wearing a white cap facing frontwards and he was in his 30's.

¶31. During the hearing, it was noted that Shelton did in fact have acne marks on both sides of his face. The Assistant Chief of Police for Yazoo City at the time of the incident, Wade Woods, testified at the hearing that Katie and Molly's description of the man was similar to two witnesses, the Brown brothers.[2]

### (4)    the level of certainty exhibited by the witness at the confrontation.

¶32. When questioned about a lineup which included Shelton, Katie stated that "I know I saw him in my mama's store that day." Katie also stated that Shelton was the man that she saw walking out of the store with her mother's purse. Molly had no doubts that the person that was leaving the store at 5:00 p.m. was the same person that was in the store earlier that day. She also testified that the person was Shelton.

### (5)    the time between the crime and the confrontation.

¶33. Molly spoke to her mother, Lisa, literally minutes before discovering her lying in blood on the floor of the store. As Katie and Molly pulled into a parking space directly in front of the store, they saw Shelton exiting the building. The police conducted three lineups on August 18, 19, and 21, 1996. Five days after Lisa was injured and died on August 21, 1996, Katie identified Shelton at the third lineup as the man that left the store with her mother's purse. Five days later on August 21, 1996, Molly also identified Shelton at the lineup as the person that was at her mother's store on August 16, 1996.

---

[2] At trial, Tommy described Shelton as wearing a cap, khaki pants, and a plaid shirt, and some facial hair. Joseph gave similar testimony as his brother. Joseph described Shelton as wearing a brown cap, brown pants and a plaid shirt.

¶34. All of the five *Biggers* factors favor admissibility in this case. Both girls saw Shelton during their two visits to their mother's store on August 16, 1996. Just moments after seeing Shelton leaving the store with their mother's purse and money bag, Molly found her mother injured and bleeding on the floor of the store. In addition, both girls gave testimony that their mother was concerned about the man in the store; and therefore, the girls paid particular attention to the man and looked at him. Further, both girls stated that the man who left the store at 5:00 p.m. was the same person who had been in the store earlier that day. Both girls were positive that they had identified the correct man at the lineup as the person that had been in their mother's store. Finally, the girls arrived at the store as Shelton was leaving, and within five days of the injury and subsequent death of their mother, the girls identified Shelton in a lineup. Looking at the totality of the circumstances, substantial and credible evidence supported the trial court's ruling to admit the evidence. We find that the testimony was sufficient for the identification to be admissible without any likelihood of misidentification or irreparable identification. This issue is without merit.

**II.   Whether the trial court erred by denying Shelton's motion for continuance based upon illness of the defense attorney.**

¶35. The standard for review for a grant or denial of a motion for continuance is within the discretion of the trial court. *Smiley v. State*, 815 So.2d 1140, 1143-44 (Miss. 2002) (citing *Coleman v. State*, 697 So.2d 777, 780 (Miss.1997)). The appellate court will not reverse the trial court unless the ruling resulted in manifest injustice. *Id. See also Simmons v. State*, 805 So.2d 452, 484 (Miss. 2001); *Gray v. State*, 799 So.2d 53, 58 (Miss. 2001); *Buckley v. State*, 772 So.2d 1059, 1060 (Miss. 2000); *Atterberry v. State*, 667 So.2d 622, 631 (Miss. 1995).

¶36. Shelton filed a motion for continuance based upon health considerations of the defense attorneys. One of the defense attorney's suffered from cancer in the previous year and had follow-up medical testing

scheduled for the week of trial. A review of the record reveals that the February 2001 motion for continuance was the second motion presented to the trial court involving medical examinations for defense counsel. Previously in July 2000 and approximately one month before an August 2000 trial date, a motion for continuance was filed by defense counsel citing, in part, that a post-operative exam for the defense attorney was scheduled for the week of trial. The trial court granted the continuance.

¶37.    By order dated October 10, 2000, the trial was rescheduled for the week of April 2-6, 2001. In February 2001, approximately a month before the new trial date, defense counsel filed the motion for continuance at issue which again was based in part upon medical testing scheduled for the week of trial. At a hearing, the trial court denied the motion for continuance and stated the following:

> On the motion to continue, this Court can sympathize with the conditions of the defendant's attorney. This case was set more than six months ago and it was cleared, the date was cleared with both sides before this Court set the court date. In order to continue this matter, this Court is looking at another year, because I have to work with Madison County court docket, and it's just too hard to try to reset within a reasonable time to retry this matter. Therefore, the motion for continuance is denied.

Shelton argues that the denial of the continuance was an abuse of discretion. By denying the motion for continuance, Shelton claims that he was denied a fair trial. Shelton alludes to the fact that this was a capital murder case with the potential for a death penalty sentence. Further, the defense attorney argues that he "clearly demonstrated that he could not effectively represent his client under the conditions imposed by his illness and that a continuance was in order."

¶38.    The State argues that the issue is not preserved for appeal purposes as there is no motion for new trial in the official record. Indeed, this Court finds that no motion for new trial is contained within the court papers before this Court, nor does there appear to be any ore tenus motion within the transcripts.    In *Crawford v. State*, 787 So.2d 1236, 1242 (Miss. 2001), this Court held that when a denial of a

16

continuance is not included as an assignment of error in a motion for new trial, the issue is not appropriate for appellate review. "On motion for a new trial, 'certain errors must be brought to the attention of the trial judge so that he may have an opportunity to pass upon their validity before this court is called upon to review them.'" *Id*. at 1242-43 (citing **Metcalf v. State**, 629 So.2d 558, 561-62 (Miss.1993)). *See also* **Farris v. State**, 764 So.2d 411, 423 (Miss. 2000). We find that this issue is procedurally barred from review.

¶39.    Notwithstanding the procedural bar, Shelton's argument still fails on the merits. This Court maintains that the trial court did not abuse its discretion, nor was there any manifest injustice to Shelton. The jury imposed a sentence of life imprisonment on Shelton. Defense counsel brought the motion for continuance based in part upon medical testing for one of the attorneys. This motion was filed approximately one month prior to trial. The trial court had previously granted a similar continuance for medical reasons in July 2000. Consequently, the trial court rescheduled Shelton's trial from October, 2000, to April, 2001. Defense counsel knew a number of months in advance of this rescheduled trial date. The trial court denied the continuance based upon the advanced notice of the new trial date, the fact that the new trial date was "cleared" with all parties and the time and scheduling constraints for the trial court. Clearly, the trial court was within its discretion to deny the continuance. Accordingly, this Court finds that this issue is without merit.

### III.    Whether the trial court erred by failing to grant Shelton's motion for mistrial after a prospective juror stated in voir dire that this was the second capital murder trial for Shelton.

¶40.    Shelton contends that the jury pool was contaminated and his case was prejudiced after a venire person stated that this was Shelton's second murder trial.

17

¶41.    In *Caston v. State*, 823 So. 2d 473, 492 (Miss. 2002), this Court set out the standard of review

for a motion for mistrial as follows:

> "Whether to grant a motion for mistrial is within the sound discretion of the trial court. The standard of review for denial of a motion for mistrial is abuse of discretion." ***Pulphus v. State***, 782 So.2d 1220, 1222 (Miss. 2001)(citations omitted); ***Spann v. State***, 771 So.2d 883, 889 (Miss.2000); ***Johnson v. State***, 666 So.2d 784, 794 (Miss. 1995); ***Hoops v. State***, 681 So.2d 521 (Miss. 1996). "The failure of the court to grant a motion for mistrial will not be overturned on appeal unless the trial court abused it discretion." ***Bass v. State***, 597 So.2d 182, 191 (Miss. 1992).

Indeed, the Uniform Circuit and County Court Rule 3.12 concerning mistrials states:

> Upon motion of any party, the court may declare a mistrial if there occurs during the trial, either inside or outside the courtroom, misconduct by the party, the party's attorneys, or someone acting at the behest of the party or the party's attorney, resulting in substantial and irreparable prejudice to the movant's case.

> Upon motion of a party or its own motion, the court may declare a mistrial if:
>    1.    The trial cannot proceed in conformity with law; or
>    2.    It appears there is no reasonable probability of the jury's agreement upon a verdict.

(emphasis added).  During the voir dire, the State questioned venire person Makeba Wilson as follows:

**State:** Yeah. We probably all would agree on that.  Now, first, to explain something about the system, and the Judge just explained to you that if we did get to a second phase, that you have to listen to the instructions and weigh things.  Now, you have said your beliefs here, if we do get to the second phase, if you're selected to sit on this jury and we get to a second phase, that will mean that you, in your mind, beyond a reasonable doubt, have found Mr. Shelton guilty of murder in which he's accused of. That will be the first phase.  I'm saying if you found that. If you found that, then that will be the murder.  I mean that would be what you're going in on.  So knowing that and what opinion you gave us here, would you go into the penalty phase saying,  "Well, he should be put to death?"

A.    **Well, no I wouldn't.  I mean just, well, but, well, I'm going to say this right here: I've heard some people say up in here that he had a trial before, and it was a hung jury, so I mean I can't say that if he's going to be guilty or not guilty.**

Q. Okay. Well, would that fact enter your mind in any way as far as a trial that you heard that he had a trial before?

A. No, it ain't going to affect me at all. I mean it's just something I heard. I mean it wouldn't affect my decision if I'm on the jury.

During the individual voir dire by defense counsel, Wilson was questioned, in part, as follows:

Q. And, now, I would request permission from the court to inquire as to what is the source of the statement that there was a hung jury.

Court: Okay, you may.

Q. Ms. Wilson, I thank you for raising that with us that someone had said there was a hung jury; right?

A. Yes.

Q. Where did you hear that at?

A. You - - the woman, I don't even know her name, she was Juror No. 1, and that's where I heard it at. Because that's when I was sitting over there when we first started, and that's where I heard it.

Q. Before the Judge had a chance to say anything to you?

A. Yes. Like I said, that's just hearsay. That's not going to affect my decision if I'm on the jury.

Shortly thereafter, defense counsel for Shelton requested a mistrial and stated the following:

However, I'm at this time, going to move for a mistrial because of the statements made by the lady in the audience during the course of our voir dire. I think that she had and we've had several jurors come in and talk about it. I think she has what's the word vitiated this panel to the point, contaminated this panel, to the point that I think that she has irreparably injured this defendant's chances of getting a fair trial. That being the case, I would move for a mistrial and ask that all jurors be stricken.

In denying the motion for mistrial, the trial court ruled:

The motion for mistrial is denied although there was a juror who made the statement that this was the second trial. But each of the members that have been in the panel that has made reference to that, they have all stated that it would not have any effect on their ability to sit and render a fair and impartial judgment in this case. And this Court will inquire as to whether or not there was any other members in the panel that has been affected by this statement made by juror, Ms. Pruitt. I think she was 22.

¶42. We find that the trial court did not abuse its discretion by denying the motion for mistrial. There was no showing of misconduct that resulted in substantial or irreparable harm to Shelton's case pursuant

to URCCC 3.12. Prior to making peremptory challenges, the trial court acknowledged that a few prospective jurors heard that this was a second trial for Shelton, but that the information would not affect their ability to make a decision. Nevertheless, the trial court granted an additional peremptory challenge to Shelton and the State. None of the 12 jurors chosen to serve on the jury expressed any misgivings that this was Shelton's second trial. Despite arguing that Wilson tainted the jury pool by revealing that another venire person stated that this was Shelton's second trial and the previous trial resulted in a hung jury, the defense never made a peremptory challenge against Wilson. In fact, Wilson was ultimately selected as a juror on the case. Accordingly, this Court finds that this issue is without merit.

**IV.    Whether the trial court erred in refusing to grant Shelton's motion for a mistrial based on the witness's improper comment regarding Shelton's right to testify or remain silent under Amendment V of the United States Constitution and Article 3, Section 26 of the Mississippi Constitution of 1890.**

¶43.    As previously stated in Issue III, the standard of review for a motion for mistrial is an abuse of discretion. *Caston*, 823 So. 2d at 492; *Pulphus*, 782 So.2d at 1222. The grant or denial of a motion for continuance is within the sound discretion of the trial court. *Id*.

¶44.    Shelton argues that the trial court erred by failing to grant his motion for mistrial when a witness, Chief Bobby Adams (Chief Adams), allegedly made a backdoor attempt to comment on Shelton's right to remain silent or to testify. He claims that the comments were prejudicial and amounted to reversible error.

¶45.    During the direct examination of Chief Adams the following exchange occurred:

Court: Okay. The state may proceed.
[State]:    I believe I had asked you if there was an attempt to interview Mr. Shelton after his arrest on the 21st of August.
A.    Yes.
Q.    And, again, would you tell us who was present at that time?

20

| | |
|---|---|
| A. | Myself, Assistant Chief Wade Woods, and Detective Michael Wallace? |
| Q. | And was Mr. Shelton advised of his Miranda Rights? |
| A. | Yes, by Assistant Chief Wade Woods. |
| Q. | Okay, and did he - was he promised anything in order to get him to talk? Were any threats made to him or other types of inducements? |
| A. | No. |
| Q. | Did he agree at that time to talk to you? |
| A. | He made a statement. |
| Q. | And basically what statement was - what questions were asked of him and what did he say? |
| A. | After being advised of his Miranda Rights, Assistant Chief Wade Woods asked Mr. Shelton if he was in downtown Yazoo City on Friday the 16th at about 5:00, and Mr. Shelton's response was yes. |
| **Q.** | **Okay. All right. Was any other statements made?** |
| **A.** | **Mr. Shelton stopped talking at that time. No other statement was made.** |
| [Defense] | Objection. Mistrial...He said Mr. Shelton stopped talking at that point. That's the key point. You cannot use a man's silence against him, and obviously he saying Mr. Shelton chose to stop talking. |

(emphasis added). The trial court denied the motion for mistrial and stated the following:

> I think nothing further than the fact that he stopped talking does not raise the ground for mistrial. That would be denied. I want you to kind of stay away from that so he can't go any further.

We find that the trial court did not abuse its discretion by denying the motion for mistrial. The trial court determined that merely stating that Shelton stopped talking did not rise to the level of mistrial. Shelton cites no case law authority whatsoever to support his claim that he was prejudiced by Chief Adams's statement. This Court finds that this issue is without merit.

### V. Whether the court committed reversible error when it refused to grant a directed verdict.

¶46. Shelton captions his last assignment of error in terms of the trial court's refusal to grant a directed verdict. However, the limited case law cited in support of his contention concerns both the weight of the evidence and the sufficiency of the evidence. There appears to be some confusion by Shelton.

21

Nevertheless, the directed verdict and the sufficiency of the evidence have the same standard of review and will be addressed by this Court.

¶47.    The crux of Shelton's argument is that no physical evidence linked him to the murder scene.   In particular, Shelton argues that his fingerprints were not present at the murder scene, no murder weapon was recovered, and no witness testified that he had  a weapon.

### Standard of Review

¶48.    In *Jefferson v. State*, 818 So.2d 1099, 1110-11 (Miss. 2002), this Court held that the standard of review for denials of motions for directed verdict, judgment notwithstanding the verdict and a request for a peremptory instruction is the same.  A directed verdict, judgment notwithstanding a verdict and a request for peremptory instruction all challenge the legal sufficiency of the evidence presented at trial. *Id.* "Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court. This occurred when the Circuit Court overruled [the] motion for JNOV." *McClain v. State*, 625 So.2d 774, 778 (Miss. 1993) (citing *Wetz v. State*, 503 So.2d 803, 807-08 (Miss.1987)). *See also Edwards v. State*, 800 So.2d 454, 462 (Miss. 2001) (The standard of review for a JNOV and a directed verdict are the same and implicate the sufficiency of the evidence.  All challenge the legal sufficiency of the evidence.  The appellate court properly reviews the ruling on the last occasion the challenge was made in the trial court, when the circuit court overruled the JNOV).

¶49.    Shelton made a motion for directed verdict at the close of the State's case in chief.  The trial court denied the motion for directed verdict.  Subsequently, Shelton proceeded to introduce evidence on his own behalf.  In *Simmons v. State*, 722 So.2d 666, 672 (Miss. 1998), this Court held that "[w]hen the defendant proceeds with his case after the state rests and the court overrules the defendant's motion for

a directed verdict, the defendant has waived the appeal of that directed verdict." *Id.* at 672 (citing *Holland v. State*, 656 So.2d 1192, 1197 (Miss.1995)). Therefore, Shelton effectively waived his motion for directed verdict when the trial court denied the motion and he proceeded with his case.

¶50.    While the motion for directed verdict was raised by Shelton after the State rested its case, the trial court denied it. This Court finds that the record contains no motion for JNOV or incidentally a motion for new trial, either in the court papers or in an ore tenus motion before the court. Shelton is therefore procedurally barred on this issue.

¶51.    Nevertheless, assuming arguendo that the issue was not procedurally barred from review, this Court will analyze the argument in light of a JNOV. Since a directed verdict and JNOV have the same standard of review, appellate courts properly review the last occasion the challenge was made in the trial court, when the trial court denied the motion for JNOV.

¶52.    The evidence sub judice shows that Lisa, the victim, was worried about a customer in her store. Katie and Molly were in their mother's store on Main Street in Yazoo City between 3:00 to 4:00 p.m. on August 16, 1996. The girls paid particular attention to the customer because their mother expressed her concern about him. Both girls looked at the customer, who they both identified later as Shelton. The girls left the store after Shelton. Molly spoke to her mother around 5:00 p.m. Lisa told Molly that she had one more customer but to come a pick her up from the store. When the girls drove the two to three minute trip to the store and pulled their car into a parking space, they both saw Shelton exiting the store with their mother's purse and money bag. Molly entered the store, saw her mother lying in a pool of blood and called 911. Katie, on the other hand followed Shelton up the street, lost him, went home to get her father and returned to the store to see her mother with blood coming from her head. Both girls identified Shelton at a police lineup on August 21, 1996. ¶53.    A number of other witnesses placed Shelton in the area

23

that day. Hicks, Shelton's friend, saw and spoke to Shelton at a nearby store on Main Street at about 4:00 p.m. that day. When Hicks left the store around 4:20 p.m., he saw Shelton speaking to the Brown brothers, Tommy and Joseph.

¶54. Tommy and Joseph gave similar testimony. Shelton spoke to the brothers, who were laying brick at another store on Main Street, numerous times that day. According to the brothers, Shelton kept asking them the same questions over and over again, such as how long were they going to be in the area. Both brothers described Shelton as wearing a cap, tan or brown pants, and a plaid shirt. Katie and Molly gave a similar description of Shelton.

¶55. Chief Adams also testified that he was present at the questioning of Shelton. After receiving his *Miranda* rights, Shelton was asked if he had been in downtown Yazoo City on August 16th at about 5:00 p.m. Shelton responded in the affirmative.

¶56. Baisello and Mercer testified to information related the crime. Baisello, an FBI agent, received a call from the Yazoo County jail from a man identifying himself as Shelton. Baisello later confirmed that Shelton was in the jail on the date of the call. The caller basically told Baisello of a murder that happened in an antique store and that a claw hammer was not the murder weapon in the case, but rather a blunt object. Mercer, an inmate, testified that Shelton discussed his case with Mercer. According to Mercer, Shelton told him that his case involved a middle aged woman in Yazoo City. Shelton "scoped" the place for a few days. Prior to closing, Shelton hit the woman with a pipe wrench and left with the purse and money bag.

¶57. Dr. Hayne testified that the cause of Lisa's death was blunt force trauma. He also testified that either a pipe or crescent wrench could produce the type of injuries sustained by Lisa if they were struck on the flat surface, large in size and delivered with force.

¶58. This ample evidence is legally sufficient to support the conviction here. We find that this issue is without merit.

## CONCLUSION

¶59. For these reasons, we affirm the judgment of the Yazoo County Circuit Court.

¶60. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OR BENEFIT OF PAROLE, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, CARLSON AND GRAVES, JJ. CONCUR. DIAZ, J., NOT PARTICIPATING.**