# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-KA-02348-SCT

*WILLIE HUTCHINSON WILLIAMS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/12/2004 |
| TRIAL JUDGE: | HON. C. E. MORGAN, III |
| COURT FROM WHICH APPEALED: | GRENADA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT T. LASTER, JR. |
| | PHILLIP BROADHEAD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED – 01/05/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., CARLSON AND RANDOLPH, JJ.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.    Willie Hutchinson Williams was convicted of armed robbery following a jury trial in the Circuit Court of Grenada County and sentenced to serve a twenty-year sentence in the custody of the Mississippi Department of Corrections, without the possibility of probation or parole. It is from this conviction that Williams seeks relief in the present appeal to this Court.

## FACTS

¶2. On January 3, 2004, at approximately 7:30 p.m. a man dressed in dark clothing with bushy hair entered the General Nutrition Center (GNC) store in Grenada, Mississippi, and inquired about the nutritional supplement creatine. GNC employee Charry Brown directed the man to the rear of the store, where the supplement was located. Brown was the manager and lone employee at the GNC that evening. As he pondered what type of creatine to buy, the man knocked a promotional shaker cup off of a nearby shelf. The man placed the shaker cup back on the shelf, selected the capsule form of creatine, and then approached the counter with the supplement. Brown met him in the aisle before he reached the counter. The man handed the supplement to Brown, who headed toward the counter to ring up the sale. As Brown turned toward the counter, the man struck her in the face and demanded the store's money.

¶3. As Brown began to scream, her assailant ran to the front of the store. However, shortly after scurrying to the front of the store, the man turned around and returned to the counter. He then took hold of Brown and held a red-handled steak knife to her throat. The man ordered Brown to open the cash register and threatened Brown's life several times in the process. After taking all of the money from the register, the now armed robber headed to the rear of the store to retrieve the shaker cup he knocked over earlier. As the man left the store he had in his possession the money from the cash register, a bottle of creatine capsules and the shaker cup. Before exiting the store, the man threatened to kill Brown if she contacted the authorities. He then fled on foot around the corner of the building. Brown initially testified at trial that the total amount of cash stolen from the register was "around" $233.

¶4. Once the assailant left the store Brown immediately telephoned the police, who arrived at the GNC at 7:48 P.M. Officers Justin Gammage and George Douglas were two of the first

2

officers to arrive at the scene. When Officer Gammage asked about the identity of the robber, Brown said that she recognized the culprit as Willie Summerville who lived in the Washington Garden apartment complex. Officer Gammage asked Brown if she meant Willie Williams, and she responded "yeah, that's his name." In her testimony at trial Brown, explained that she forgot that Willie used the last name Williams and not the surname "Summerville" as used by his mother. Brown informed the officers that she had known Willie "all [her] life just about" and they "grew up together in the same neighborhood." Brown also positively identified Willie Williams in a photo lineup as the man who had assaulted her and committed the armed robbery.

¶5.    While on the scene, Officer Douglas took a statement from Gwendolyn Stinson, a clerk at the Shoe Show, which is a shoe store located near the GNC in the same shopping center. Stinson informed Officer Douglas that prior to the robbery of GNC, a suspicious male entered the Shoe Show. The manager of the store noticed that the individual was acting in a peculiar manner, and directed Stinson to keep an eye on him. Stinson observed the man for approximately five minutes before he approached her and uttered "I can't seem to find no shoes today." Stinson testified at trial that as this individual addressed her, she "looked him dead straight in the face." She also maintained that the man left Shoe Show heading in the direction of GNC. After the robbery Officer Douglas produced a photo array and asked Stinson if she could identify any one of the eight men pictured as the same suspicious character she observed in her store. Stinson identified Willie Williams's picture from the photo lineup.

¶6.    Shortly after determining that Willie Williams was a prime suspect in the armed robbery, authorities traveled to Williams's residence in the Washington Garden Apartment Complex. In the meantime, Williams's mother, Mary Summerville, was contacted by a family

3

member who informed her that the police suspected her son was involved in an armed robbery. Summerville immediately and emotionally voiced concerns to her son regarding his possible involvement in the armed robbery of the GNC.

¶7. When officers arrived at Williams's home at approximately 8:17 p.m. they were met at the door by Summerville. Summerville advised the officers that Williams was present in the apartment and she allowed the officers entry into her home. The officers requested and received Summerville's consent to search the apartment. Before searching the apartment, Officer Gammage presented a consent form for Summerville to sign. After Officer Gammage explained the form and obtained Summerville's signature, a search of the apartment commenced.

¶8. The officers discovered Williams in the bathroom. He was shirtless, sweaty and in the process of cutting his own hair. The officers noticed a black tee shirt on the bathroom floor, apparently damp with sweat. During the course of searching Williams's bedroom, the police recovered $178 in cash concealed under a sheet on his bed. Thereafter the police took Williams into custody and placed him on "investigatory hold" until further questioning was conducted.

¶9. After leaving the apartment, the officers retraced a path leading from the back of the GNC to the Washington Garden Apartment Complex. A leisurely walk from the GNC to the Washington Garden Apartments was timed at approximately twelve minutes. Officers also walked the trail searching for the missing creatine and shaker cup that was stolen from the GNC. The officers did not find the creatine. However, they did find a GNC shaker cup and lid in a wooded area along the path.

4

¶10. The police clearly and concisely issued *Miranda* warnings prior to Williams's interrogation. Additionally, Williams voluntarily read aloud and signed a waiver of rights form prior to the commencement of questioning. Throughout his interview with the police Williams consistently asserted that he was not responsible for the robbery of the GNC. Williams maintained that he could not have perpetrated the robbery because he was at a friend's apartment in the Washington Garden Complex watching football when the crime was committed. During the interview, Williams stated that he was unemployed and had no source of income. Further, Williams alleged that he was unaware of any money in his room, but acknowledged he would have known had there been any present.

¶11. Williams was indicted for the armed robbery of the GNC. Williams was tried before a jury in the Circuit Court of Grenada County and was subsequently found guilty of the armed robbery and sentenced to twenty years in the Mississippi Department of Corrections. After sentencing, Williams filed a motion for a JNOV or a new trial which the trial court ultimately denied.

¶12. One day after Williams was convicted of armed robbery, his trial counsel was conducting a voir dire examination of potential jurors in a separate and unrelated case. Coincidentally a potential juror in the unrelated case had also been seated as a juror for Williams's trial. During the course of voir dire questioning in the succeeding case, the potential juror indicated that she had a relative that had been the victim of a crime. She revealed that her cousin, a member of the Bolivar County Sheriff's Department, was shot several times during a routine traffic stop. Further, the potential juror informed the trial court that the incident would not allow her to sit as a fair and impartial juror in the subsequent case.

During voir dire examination before Williams's trial potential jurors were asked a similar line of questions; however, the juror at issue failed to respond in that instance. Williams now appeals to this Court.

## DISCUSSION

### I. J.N.O.V. AND/OR NEW TRIAL

¶13. A motion for a judgment notwithstanding the verdict (JNOV) challenges the legal sufficiency of the evidence presented at trial. *Shelton v. State*, 853 So. 2d 1171, 1186 (Miss. 2003). "This Court must review the trial court's finding regarding sufficiency of the evidence at the time the motion for JNOV was overruled." *Eakes v. State*, 665 So. 2d 852, 872 (Miss. 1995); *see Wetz v. State*, 503 So. 2d 803, 807-08 (Miss. 1987). "The evidence is viewed in the light most favorable to the State. All credible evidence supporting the conviction is taken as true; the State receives the benefit of all favorable inferences reasonably drawn from the evidence." *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). "If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render." *Jefferson v. State*, 818 So. 2d 1099, 1110-11 (Miss. 2002). "Thus, the scope of review on this issue is limited in that all evidence must be construed in the light most favorable to the verdict." *Anderson v. State*, 904 So. 2d 973, 978 (Miss. 2004).

¶14. A motion for a new trial is subject to a different standard of review than does a motion for a judgment notwithstanding the verdict. *Sheffield v. State*, 749 So. 2d 123, 127 (Miss. 1999). While a judgment notwithstanding the verdict tests the legal sufficiency of the

6

evidence and "asks the court to hold, as a matter of law, that the verdict may not stand . . . [t]he motion for a new trial is an altogether different animal." *Jesco, Inc. v. Whitehead*, 451 So. 2d 706, 713-14 (Miss. 1984) (Robertson, J., specially concurring). "A motion for a new trial simply challenges the weight of the evidence." *Jones v. State*, 2005 WL 1712995, *15 (Miss. 2005)(citing *Sheffield*, 749 So. 2d at 127). Moreover, "[a] greater quantum of evidence favoring the party against whom the motion is made is necessary for that party to withstand a motion for a new trial as distinguished from a motion for j.n.o.v." *Jesco*, 451 So. 2d at 714.

¶15.    We will not order a new trial unless convinced that the verdict is "so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable justice." *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005). Therefore, this Court will only reverse the trial court's denial of a motion for a new trial if the trial court has abused its discretion. *Id* at 845.

¶16.    Williams asserts that the evidence presented by the State does not sustain a finding that he committed armed robbery because the evidence presented at trial was weak, inconsistent, and not credible. First, Williams contends that discrepancies exist between the physical descriptions of the assailant by Charry Brown and Gwendolyn Stinson. Second, Williams claims that because the amount of money recovered from his bed differs dramatically in amount and denomination from the amount stolen from the GNC, the likelihood that Williams was the involved in the armed robbery is not probable. Williams also submits that a lack of physical evidence is fatal to the verdict returned by the jury. Finally, Williams maintains that his alibi completely absolves him of this crime.

7

¶17. Conversely, the State asserts that the evidence presented at trial is sufficient to support a conviction and no "unconscionable justice" has ensued. *Jones v. State*, 635 So. 2d 884, 887 (Miss. 1994). Further, the State directs this Court's attention to an assortment of facts in the record in support of the jury's verdict.

¶18. First, the State points to Brown's identification of Willie Williams as the man who entered the GNC and held a knife to her neck. Second, the State relies on Stinson's corroborative testimony that she positively identified Williams as the suspicious person who entered and exited Shoe Show just before the robbery occurred. Third, the State contends that the concealed money discovered in Williams's bed is relevant evidence. The State submits that this evidence tends to prove Williams's guilt when taking into account the concealment of the money, Williams's denial of having any money, a job or other source of income, Williams was sweaty when officers arrived at his apartment, and Williams was in the process of changing his appearance by cutting his own hair, at a time he knew the police were looking for him. Moreover, the trial court ruled on this issue during trial and determined that "it will be for the jury to decide as to the weight and worth of it . . . the probative value outweighs any prejudicial effect[.]" Finally, the State calls this Court's attention to the testimony of Brian Crystal, Williams's alibi witness. At trial Crystal initially testified that Williams arrived at his apartment around 6:30 to 7:00 p.m. to watch football and stayed for about forty-five minutes to an hour. However, Crystal also admitted that when detectives first interviewed him, he told them that Williams arrived at his apartment around 6:00 p.m. Crystal could not remember either of the teams in the football game. Further Crystal admitted that he was not wearing a watch during Williams's visit.

¶19. Williams urges this Court to consider that he was entitled to a judgment notwithstanding the verdict, or in the alternative a new trial. However, there is a wealth of evidence in the record to support Williams's armed robbery conviction. As this Court explicitly stated in *Neal v. State*, 451 So. 2d 743, 758 (Miss. 1984), "[u]nder our system, the jury is charged with the responsibility for weighing and considering conflicting evidence and the credibility of witnesses." *See, e.g.*, *Pearson v. State*, 428 So. 2d 1361, 1363 (Miss. 1983); *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980). Further, this Court has held that "we do not reverse criminal cases where there is a straight issue of fact, or a conflict in the facts; juries are impaneled for the very purpose of passing upon such questions of disputed fact, and we do not intend to invade the province and prerogative of the jury." *Hyde v. State*, 413 So. 2d 1042, 1044 (Miss. 1982) (quoting *Evans v. State*, 159 Miss. 561, 132 So. 563, 564 (1931)).

¶20. After diligent review of the record we find that this issue is without merit.

## II.    JUROR'S FAILURE TO RESPOND

¶21. During the voir dire examination the following question was asked of all potential jurors: "How many of you have ever had a family member who has been a victim of some type of crime?" Patricia Bennett, juror number 38, failed to respond to this question and was subsequently empaneled as a juror in the case at bar. The jury returned a verdict of guilty in this matter.

¶22. One day after Williams was convicted of armed robbery Patricia Bennett sat as a potential juror in a separate and unrelated criminal matter involving a drive-by shooting. Williams's trial counsel was also acting defense counsel in the subsequent case. The trial

court conducted a portion of the voir dire examination. The court posed questions which elicited several material responses from Bennett.

BY THE COURT: Is there anybody who has had a family member who has been in law enforcement but is not now? . . .

A. I have a cousin that was in the Bolivar County Sheriff's Department.

Q. Ms. Bennett, would that affect you at all in this matter?

A. No, sir.

. . .

BY THE COURT: How many of you have ever been or had a family member who has been the victim of a crime of any kind? . . .

Q. Ms. Bennett?

A. I have a cousin that was doing a routine traffic citation, and he was shot several times.

Q. Okay, that occur here?

A. In Bolivar County.

Q. Bolivar County. Would that affect you at all in this matter and keep you from being fair and impartial?

A. Yes, sir. It would.

. . .

BY THE COURT: Okay, how many of you have ever had a family member who has been charged with a felony crime? . . .

A. I have a brother serving time for drug charges.

Q. Would that affect you at all?

A. No.

10

¶23.    Once the trial court completed its voir dire examination of potential jurors in the subsequent case, the State and counsel for the defendants were allowed to conduct voir dire. Relevant questions and Bennett's reply follows:

> BY COUNSEL FOR FIRST DEFENDANT:  The District Attorney just told you that there was a drive-by shooting and Keno Bounds was shot and is now paralyzed.  He is in a wheelchair.  Would the fact that Keno Bounds was shot and in a wheelchair, is now in a wheelchair, would that cause you to have sympathy for Keno Bounds and perhaps disregard what the real question, the fact that you have to find him guilty beyond a reasonable doubt?  Would that cause you to be swayed in anyway, the fact that he is shot and in a wheelchair?. . .
>
> Q.  Yes, ma'am?
>
> A.   I don't know if I could or not.  I had a relative that went through a similar incident, and the magnitude he had to go through and suffer and the loss to his family, and I just–
>
>> BY THE COURT:  –Ms. Bennett, I believe you have already told me that because of that, you didn't think you could be fair and impartial.  Isn't that correct?
>
> A.  Yes, sir.

¶24.    Counsel for the first defendant completed his questioning without further response from   Bennett.    The trial court also allowed counsel for the second defendant an opportunity to voir dire the jury pool.   Moreover, counsel for the second defendant was trial counsel for Williams where trial preceded the following interchange:

> BY COUNSEL FOR SECOND DEFENDANT: There is just a couple of questions.  I will start off here.  Now Ms. Bennett, number 38.  I understand that you had an uncle in law enforcement.  I remember that from the other day, but you said something new today about that you didn't tell me Monday; right?  There was somebody that was killed?
>
>> BY THE COURT: Ms. Bennett has already said she could not be fair and impartial because of that incident.

BY COUNSEL: Yes, sir. I was just clarifying the accuracy.

A. I had a cousin that went through a similar incident with this, and I just don't think it would be fair.

Q. That is fine. But my question was you didn't, I didn't have it in my notes that you did that on Monday; right?

A. Monday wasn't a shooting. It's totally different.

¶25. Williams charges that a reasonable inference can be made that he was prejudiced as result of Patricia Bennett's failing to disclosure that a member of her family had been the victim of a crime. This Court in *Odom v. State*, 355 So. 2d 1381, 1383 (Miss. 1978), declared:

> we hold that where, as here, a prospective juror in a criminal case fails to respond to a relevant, direct, and unambiguous question presented by defense counsel on voir dire, although having knowledge of the information sought to be elicited, the trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered. It is, of course, a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong.

In the case at bar, it is apparent to this Court that the question propounded to Bennett was (1) relevant to the voir dire examination, (2) unambiguous, and (3) the juror had substantial knowledge of the information sought.[1] Nevertheless, each case involving the voir dire of

---

[1]While the trial judge did not explicitly state them as such, it is obvious after a thorough review of the record that trial judge applied the factors set forth in *Odom*.

12

prospective jurors must be decided on an ad hoc basis considering the facts then before the court. *Id*.

¶26.    In this case, we find no reasonable inference of prejudice as Williams insists. As previously discussed there is a vast amount of evidence in the record supporting Williams's guilt including:

1. Positive identifications of Williams by two witnesses,

2. Concealed money discovered in Williams's bed,

3. Williams's sweaty appearance when the police arrived,

4. Williams's decision to cut his hair, even after learning that he was wanted for questioning by the police in connection with an armed robbery,

5. Inconsistencies in statements given by Williams's alibi witness.

After considering the totality of the evidence, we conclude that the facts are overwhelmingly in favor of the verdict returned by the jury. Moreover, no reasonable juror could have reached a contrary verdict in the case at bar.

¶27.    Further, when defense counsel inquired as to the reason Bennett could remain impartial in Williams's trial and not the subsequent trial she drew a clear distinction and stated "Monday wasn't a shooting. It's totally different." Bennett's declaration is a strong indicator that she was not partial in reaching her verdict during Williams's trial.

¶28.    Additionally, Bennett insisted that she would be able to remain impartial in spite of her cousin's former employment in the Sherriff's Department. Bennett also maintained that she could remain impartial regardless of the fact that her brother had been charged with a felony

in the past. Thus, Bennett plainly differentiated the shooting from all other instances presented.

¶29. Hence, after considering her statements in toto, it is apparent that Bennett clearly distinguished an armed robbery by exhibiting a knife from a drive-by shooting. Therefore, we find that this issue without merit.

## CONCLUSION

¶30. For these reasons, the trial court did not err in denying the motion for J.N.O.V. or for new trial. The evidence before us is overwhelmingly in favor of the verdict rendered by the jury. Therefore, we affirm the trial court's judgment.

¶31. **CONVICTION OF ARMED ROBBERY AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND PAY ALL COURT COSTS, FEES AND ASSESSMENTS, AFFIRMED.**

**WALLER, P.J., EASLEY, CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. COBB, P.J., AND GRAVES, J., CONCUR IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**